UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CLAIRE HALL and
JAMES HALL,
*Plaintiffs,*

v.

SOUTH KINGSTOWN POLICE
DEPARTMENT, through the
Town Manager James Manni;
POLICE CHIEF MATTHEW C.
MOYNIHAN, POLICE OFFICER
MATTHEW WHITE and POLICE
OFFICER ANTHONY SOUZA,
*Defendants.*

C.A. No.: 1:23-cv-00359-MSM-PAS

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.    FACTS AND TRAVEL OF THE CASE

Plaintiff, Claire Hall, was arrested on February 9, 2023, by members of the South Kingstown Police Department for obstructing an accident investigation, disorderly conduct, and resisting arrest while on the left side of Route 1 North in South Kingstown.

On the day of the arrest, Plaintiff Claire Hall was driving home, when she observed two younger male drivers on the side of the road who appeared to be in a motor vehicle accident. The two drivers were Samuel St. Hilaire and Van Limoges. Plaintiff Claire Hall's Deposition, p.84, attached hereto as Exhibit A. Hall had pulled over to the left side of Route 1 North behind the two vehicles involved in the motor vehicle accident. Id. Plaintiff Claire Hall parked and exited her vehicle to check on Samuel St. Hilaire and Van Limoges who were standing on the grass near the median. Plaintiff Exhibit A, p.8 5-88.

1

Samuel St. Hilaire and Van Limoges told Plaintiff Claire Hall that 911 had been called. Exhibit A, p.89. Plaintiff Claire Hall observed that Mr. Limoges possibly had a head injury, so she sat with Mr. Limoges, as she felt he was shaken up. Exhibit A., pp.89-90. Plaintiff Claire Hall then assisted Mr. Limoges by calling his father on her cell phone. Exhibit A, p.92.

Officer Souza was the first officer to arrive on the scene. Exhibit A, p.92. He told Hall that they needed to "clear the scene"' Ex. A, p.96.  Officer White, equipped with a body-worn camera, arrived moments later.  The entirety of White's 25-plus minutes on the scene is accurately captured on his body-worn camera, which can be accessed via this link:

https://www.dropbox.com/s/ltrj4dvg0t7riya/Axon_Body_3_Video_2023-02-09_1522.mp4?dl=0

The arrival on the scene and encounter with Ms. Hall is primarily within the 1m 20s mark and the 6m 50s mark.

Officer White initially thought Ms. Hall was involved in the accident, asking "three car"? (1m 47s). He immediately requested that Mr. Limoges put the car in park and asked him to turn off the vehicle, which Limoge was unable to do because the key was "stuck." (1m 59). Mr. Limoges stepped out of the vehicle and as Officer White was speaking to him, Claire Hall approached and asked, "do you think he's going to be taken from the scene?" and advised that she was on the phone with his father. (2m 16s).  When Officer White was told that Hall's vehicle was not involved, he told her "we need to get that vehicle off the road" (2m 24) and asked her to move the car into the parking lot off the highway. She again started to ask to convey information to Limoges' father and White answered, "we will take care of that" while Officer Souza responded that that the paramedics were on their way to "check him out". (2m 30s).

Dissatisfied, Hall continued to insist that she needed information for Mr. Limoges's father. Officer Souza advised her that they were in the middle of a highway" and Officer White again

asked Hall "Can you move your car please? Thank you." (2m 39s). White questioned St. Hilaire whether his vehicle was drivable and advised that they were going to get it off to the side of the road when Ms. Hall came up to them and again interrupted Officer White. (2m 42s). Noting that she "could leave", she again stated that "I just want you to tell me what to tell his father." (2m 44s). Officer White advised her that she didn't have to leave but she had to move her car. (2m 46s).

Turning his attention to Mr. Limoges, Officer White asked him to have a seat at the center of the median and, as he was asking whether Limoges was ok, Ms. Hall can be heard attempting to interrupt saying, "I just want you to tell me ... where ... where?". (2m 50s). As White was asking Limoges questions, Hall physically asserted herself into their space, saying "Do you want to talk to his father? Here, why don't you talk to his father", while simultaneously thrusting her phone at White. (2m 57s). White replied that he was working and asked the Plaintiff to "please go sit in [her] car" as she had "nothing to do with this". (3m). Rather than comply with Officer White's order, Plaintiff continued to argue, stating that she was an attorney and Mr. Limoges was a minor and that White "needed to tell her where [Limoges] was going to be. (3m 3s). White advised her that he did not "need" to tell her anything and that he was going to arrest her in a second if she did not get into her car. (3m 10s). She did not get in her vehicle and White advised her that she was impeding an investigation, again commanding her to go sit in her car. (3m 13s).

Upon the threat of being arrested, Plaintiff Claire Hall ignored White's orders, loudly demanding "What should I tell his father?" (3m 15s). White responded that he would talk to the father "in a minute" and shouted at her "get in your car NOW!". (3m 18s). Hall did not comply but instead held her cell phone directly in front of Officer White's face saying "Tell him. Here, take it!". (3m 19s).

3

Officer White then attempted to place the Plaintiff Claire Hall under arrest, but she resisted arrest, screaming "don't touch me!" and struggled to get away. (3m 24s). As Hall was resisting, Officer Souza assisted Officer White by using a leg sweep to get Plaintiff Claire Hall to the ground in order to get the handcuffs on. (3m 30s). Once the handcuffs were on Hall, she was helped up. (5m 30s). She was brought to a police cruiser while screeching, cursing and causing a commotion, at one point screaming "this man is beating the shit out of me!" while Officer Souza was gently escorting her to the cruiser. (5m 55s).

Hall was brought to the station for booking and was released that same day. She was charged with disorderly conduct, R.I. Gen. Laws §11-45-1, obstructing an officer in execution of duty, R.I. Gen. Laws §11-32-1 and resisting legal or illegal arrest under R.I. Gen. Laws §12-7-10. Several months later, the charges were dismissed without prejudice under R.I. Gen. Laws §12-10-12, requiring Hall to be of good behavior and keep the peace for one year in order to avoid the charges being resurrected.

After Hall's arrest, the Town of South Kingstown Police Department began receiving numerous, expansive APRA requests. Plaintiff Claire Hall has made five APRA requests under the pseudonym John Doe, one under the pseudonym Jane Doe, one under the pseudonym Jean Doe, one the pseudonym under Johnny Doe, one under the pseudonym Jenny Doe, one under the pseudonym Jackie Doe, one under the pseudonym Jazz Doe, and one under the pseudonym Bob RIPTA. Exhibit A, p 62-63. By her own admission, Plaintiff Claire Hall stated that she was the only person making the APRA requests and that her husband did not make any requests relating to this incident. Plaintiff's Deposition page 141. When her initial APRA, expansive, APRA request was returned with an estimate cost of $2 million, she went on to make multiple narrower APRA requests under pseudonyms until she paid the estimated costs and received her records.

## II.    STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, summary judgment is appropriate if the pleadings and discovery demonstrate that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 24 (1st Cir. 2009); *Commercial Union Ins. Co. v. Pesante*, 459 F.3d 34, 37 (1st Cir. 2006) (*quoting* Fed. R. Civ. P. 56(c)).  In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party."  *Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir. 2000) (*citing Mulero-Rodriguez v. Ponte, Inc.,* 98 F.3d 670, 672 (1st Cir. 1996)).  A nonmoving party cannot rest on its pleadings but must "set forth specific facts demonstrating that there is a genuine issue for trial" as to the claim that is the subject of the summary judgment motion.  *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 105 (1st Cir. 1988).

## III.    ARGUMENT

### A.    Counts I, II, III, IV, V, VI and IX: Civil Rights Claim; Excessive Force and Police Brutality; False Arrest and Imprisonment; Assault and Battery, Malicious Prosecution; Intentional Infliction of Emotional Distress

Count I presents a sweeping, non-specific claim of "civil rights violations", without stating the constitutional bases therefor, but which seems to incorporate as its predicate those claims made in Counts IV, V, VI and X for excessive force and police brutality, assault and battery, false arrest and imprisonment, malicious prosecution and intentional infliction of emotional distress.  A fair reading of the claim against "all defendants" imply a violation of Hall's rights under the Fourth, Eighth and Fourteenth Amendments.  Defendants are entitled to

summary judgment on the above counts.

### 1. *Counts I and II - False Arrest/False Imprisonment*

In order to make out a claim under § 1983 for a violation of the Fourth and Fourteenth Amendment rights to be free from unreasonable seizure, a plaintiff must first demonstrate that the defendants' conduct constituted a Fourth Amendment "seizure" and that the seizure was unreasonable based upon the totality of the circumstances leading up to the detention. *Bielanski v. County of Kane,* 550 F.3d 632, 637 (7th Cir. Ill. 2008*); St. Hilaire v. City of Laconia*, 71 F.3d 20, 26 (1st Cir. 1995)*.* Only unreasonable seizures are forbidden by protections of the Fourth Amendment. *Ahern v. O'Donnell,* 109 F.3d 809, 816 (1st Cir. 1997). The reasonableness inquiry is twofold: "[f]irst, the officer's action must be 'justified at its inception'"; and second, the seizure must be "reasonably related in scope to the circumstances which justified the interference in the first place." *King,* 990 F.2d at 1557 *(quoting Terry v. State of Ohio,* 392 U.S. 1, 20, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)).

The Fourth Amendment "guarantees individuals 'the right to be secure in their persons ... against unreasonable . . . seizures of the person,'" extending its protections to unjustified arrest and detention. *Pena-Borrero v. Estremeda*, 365 F.3d 7, 12-13 n. 8 (1st Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)). Similarly, under Rhode Island law, false arrest is defined as "the restraint of another person without legal justification or without any color or legal authority." *Henshaw v. Doherty*, 881 A.2d 909, 919 (R.I. 2005) (citations omitted). "[T]he viability of claims of false arrest and unreasonable seizure hinges on the same question: was there probable cause to arrest and seize [the plaintiff]? Where probable cause is present, both causes of action must fail." *Ferreira v. City of East Providence*, 568 F. Supp. 197, 212 (D.R.I.

2008)*, citing Henshaw v. Doherty, id.; Vigeant v. United States*, 462 F. Supp. 2d 221, 227 (D.R.I. 2006).

Probable cause exists "when the facts and circumstances within the officer's knowledge at the time of arrest, and of which he has reasonably trustworthy information, would warrant a reasonably prudent person's belief that a crime has been committed and that the suspect committed the crime." *Medeiros* at 11, citing *Winn v. Collins*, 723 A.2d 798, 799 (R.I. 1998); *United States v. McFarlane*, 491 F.3d 53, 56 (1st Cir. 2007). A subsequent decision to drop the charges stemming from an arrest does not establish lack of probable cause at for the arrest. *Id., citing Floyd v. Farrell,* 765 F.2d 1, 5 (1st Cir. 1985).

Here, it is clear that Officers White and Souza were acting in accordance with South Kingstown Police Department No.420.03, Traffic Accident Investigation, requiring police officers responding to an accident scene to, inter alia:

> 7. ***Identify witnesses; obtain statements and record accident information***.
>
>> a. If the investigating officer determines because of injury or other factors that it is in the best interest of the investigation to delay taking a formal statement, arrangements should be made for the statement to be taken at a later time.
>>
>> b. If the operator refuses to provide a written/formal statement, the investigating officer will note this fact in the narrative section of the accident report.
>
> 8. Establish a safe traffic pattern around the scene*; **remove non-essential persons,** and* isolate, if necessary.
>
> 9. Remove involved vehicles and debris from the road.

*See* SKPD Policy 420.03, attached hereto as Exhibit B.

The defendant officers were charged with the responsibility of gathering and recording

accident information and removing vehicles and non-essential persons from the roadway. The plaintiff repeatedly interrupted the defendant officers as they were attempting to gather information and inserted herself into conversations involving the officers and involved parties. Additionally, she ignored at least nine lawful commands to move her car or sit in her car. Rhode Island law provides:

### § 11-32-1. Obstructing officer in execution of duty.

Every person who shall obstruct any officer, civil, military, or otherwise, including any state, city, or town police, deputy sheriff, or firefighter, while in the execution of his or her office or duty, shall be imprisoned not exceeding one year or be fined not exceeding five hundred dollars ($500).

This very Court has recognized that a police officer may seize a person where he or she is interfering with a police officer's duties. See *Ferreira* at 212 (police were well within their authority to preventively seize and arrest plaintiff, both for his obstructive actions and to prevent further interference and increased danger).

Similarly, plaintiff's refusal to remove her vehicle that was obstructing a highway, and her loud and tumultuous behavior in the middle of a busy highway, including screaming at the top of her lungs and hollering that "this man is beating the shit out of me!", is violative of the disorderly conduct statute.

### § 11-45-1. Disorderly conduct.

(a) A person commits disorderly conduct if he or she intentionally, knowingly, or recklessly:

(1) Engages in fighting or threatening, or in violent or tumultuous behavior;

(2) In a public place or near a private residence that he or she has no right to occupy, disturbs another person by making loud and unreasonable noise

8

> which under the circumstances would disturb a person of average sensibilities;
>
> \*          \*          \*
>
> **(4)** Alone or with others, obstructs a highway, street, sidewalk, railway, waterway, building entrance, elevator, aisle, stairway, or hallway to which the public or a substantial group of the public has access or any other place ordinarily used for the passage of persons, vehicles, or conveyances; procession, or gathering;

The video link provided reflects the danger Hall was creating – to herself and others – as she chose to argue with the police on a narrow median strip rather than move the vehicle that she was told to clear no fewer than nine times.

Finally, there can be serious dispute that Hall was resisting legal or illegal arrest[1], forcibly pulling away from White, struggling, turning, drawing back her arms, screaming "don't touch me!". When she was brought to the ground in an attempt to subdue her for handcuffing, she continued to struggle, screaming "no" and "I will NOT calm down". When told to stop struggling, she bellowed "no -YOU stop!".

In short, because there is video of the arrest and most of the encounter with Hall and the defendants, there are really no material facts in dispute. The defendants clearly had probable cause to arrest and prosecute Hall. It is unnecessary to examine her motives for stopping, whether it was reasonable for her to initially request information to convey, or her subjective critiques of whether she really *needed* to move her car or whether the police actually needed to do an investigation of the traffic accident at issue. The facts are clear: in executing their traffic accident investigation functions, including removal of vehicles and non-essential persons from the highway, the defendant officers together issued at least nine separate lawful orders to which the plaintiff did not comply. There was clearly probable cause to arrest and prosecute Hall.

---

[1] Even Plaintiff's police expert conceded that she was obviously resisting arrest.

Finally, even if plaintiff could successfully demonstrate that her arrest and detention infringed upon her constitutional rights, Defendant submits that plaintiff cannot demonstrate such an alleged deprivation was committed by either Chief Moynihan or the Town of South Kingstown (see *Monell* argument, Section C, *infra*).  In addition, it is undisputed that Chief Moynihan neither arrested nor detained the plaintiff in any manner.

2.    ***Counts I, II, III and IX: Excessive Force/Assault and Battery/Intentional Infliction of Emotional Distress***

Plaintiff also seeks to recover against the Defendants for the alleged use of excessive force.  Similar to a claim for unlawful seizure, a claim that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure is analyzed under the Fourth Amendment reasonableness standard.  *Graham v. Connor,* 490 U.S. 386, 395 (1989*).*

The proper inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id. at 397.*  To determine whether the force used was reasonable the jury balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id. at 396 (citations omitted).*

In addition, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham, 490 U.S. at 396 citing Terry, 392 U.S. at 20-22.*  The "reasonableness [of the officers' actions] must embody allowance for the fact that police officers are often forced to make split second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Id. at 396-97.* "Not every push or shove, even if it may later seem unnecessary . . . violates the Fourth Amendment." *Id. at 396.*

10

Rather, it is the "totality of the circumstances faced by the officer on the scene." *Lennon v. Miller,* 66 F.3d 416, 425 *(2d Cir. 1995) citing Graham,* 490 U.S. at 396*.*

In this case, the Plaintiff contends that her right to be free from excessive and unreasonable force was violated by the Defendants' action of following standard protocol to handcuff the Plaintiff while she was actively resisting arrest. A police officer's right to detain or arrest a person includes with it "the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Claims of unreasonable force are analyzed "according to the constitutional touchstone of objective reasonableness", so courts do not consider an officer's subjective "intent or motivation." *Raiche v. Pietroski*, 623 F.3d 30, 36 (1st Cir. 2010), *citing Graham* at 397.

Rather, it must only be determined if the officer used unreasonable force for the circumstance. *Id*. In this circumstance, Plaintiff Claire Hall was actively resisting arrest, causing commotion on a public highway, and impeding the officers' ability to clear an accident for public safety. The force used by Officer Souza and Officer White was merely enough to subdue the Plaintiff long enough to complete the arrest, then the Plaintiff was helped off the ground and walked over to a police cruiser.

Reasonableness of force requires courts to weigh an individual's interest against the government's, weighing three non-exclusive factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Here, all three factors weigh against Plaintiff Claire Hall. The Plaintiff's obstructed the officers' ability to execute their traffic accident response duties, including clearing vehicles and non-essential persons from a dangerous highway. While this was

certainly not a severe underlying crime, Plaintiff Claire Hall's behavior was impeding the officers' ability to clear the scene of an accident on a major roadway at the detriment to public safety. Prior to being detained, the officers asked the Plaintiff to move her vehicle at least nine times. Rather than move her vehicle, Plaintiff Claire Hall continued to harass and annoy the officers as they were working to clear the scene of an accident.

Once Officer White attempted to detain Hall, she resisted arrest. Here, Hall was actively resisting arrest as officers attempted to control her in the standing position for approximately 15 seconds. A leg sweep was executed to take her to the ground in order to keep her still. Once the Plaintiff was properly handcuffed, she was brought back up to a sitting position, then a standing position, and walked to a police cruiser. Any discomfort was caused by her own resistance, and the force used to combat her resistance was necessary in the circumstance.

The arrest itself was executed using the least amount of force necessary to counter her resistance. In *Segura v. Jones*, the Court notes that while brief handcuffing may not be comfortable or may even be painful to the arrestee, it does not rise to the level of excessive force. See *Segura v. Jones*, No. 07-1013, 2007 U.S. App. Lexis 29231 (Unpub. 10th Cir.)(no excessive force where female shoplifting suspect was pushed into wall). Similarly, the First Circuit has recently had the occasion to examine a "leg sweep" in an excessive force context, finding that a leg sweep did not constitute a violation of a clearly established right. *Segrain v. Duffy*, 118 F.4th 45,59 (1st Cir. 2024), citing *Staples v. Gerry*, 923 F.3d 7, 13 (1st Cir. 2019) (leg sweep was not objectively harmful enough to establish a constitutional violation).

As there is video evidence of the arrest, there is no genuine dispute at issue. The Plaintiff resisted arrest on the side of a busy public highway. In the interest of public safety, the officers

used the reasonable force necessary to detain the Plaintiff to get her in the police cruiser, so they could continue to clear the scene of an accident without further obstruction.

Similar to the claim for false arrest/imprisonment, the evidence will demonstrate that the officers were reasonable in their determination as to the amount of force used to detain plaintiff. Plaintiff's aggressive reaction and outright refusal to talk to the officers justified their concern for both her own and the officer's safety.  Moreover, as it specifically relates to Chief Moynihan defendant was present or participated in the detainment of plaintiff. As such, the Defendants are entitled to judgment as a matter of law.

### 3. *Counts II, III and IX: Assault and Battery, Intentional Infliction of Emotional Distress; Count VI: Malicious Prosecution*

The Plaintiff's claim for assault and battery, under Rhode Island law, cannot stand if the Defendant is determined to have used reasonable force incident to Plaintiff's arrest.  It is established that where an officer is found to be deserving of qualified immunity under federal law, he will also be granted qualified immunity for the same claim under Rhode Island law.  *See Raiche,* 623 F.3d at 40 (court's determination of reasonable force under § 1983 controls determination of the reasonableness of force used under the common law assault and battery claims); *Hatch v. Town of Middletown*, 311 F.3d 83, 89-90 (1st Cir. 2002) (holding that Rhode Island law recognizes a qualified immunity defense under state law analogous to the federal doctrine of qualified immunity).  *See also Mucci* at 548, fn5 ("because Defendants are entitled to qualified immunity on the excessive force claim, they are also entitled to immunity from suit on the state law assault and battery claims."), *citing Raiche* at 40 (1st Cir. 2010); *Santoni v. Potter,* 369 F.3d 594, 603 (1st Cir.2004). The argument applies equally to the intentional infliction claims, arising out of the exact same factual predicates

Similarly, if probable cause exists, as set forth previously herein, plaintiffs' claims for

malicious prosecution fails. *Ferreira at 212.*

As the Defendants White and Souza used only that amount of force reasonable in the circumstances, and Moynihan used no force at all, they are entitled to judgment as a matter of law.

### 4.    *Qualified Immunity*

Qualified immunity is "***an immunity from suit*** rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526, (1985) (emphasis omitted). "To determine whether a particular officer is entitled to qualified immunity, '[a] court must decide: (1) whether the facts alleged or shown by the Plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes,* 568 F.3d 263, 269 (1st Cir. 2009)*.* The second step has two aspects: (1) "the clarity of the law at the time of the alleged civil rights violation" and (2) whether, on the facts of the case, "a reasonable defendant would have understood that his conduct violated the Plaintiffs' constitutional rights." *Id. See also Anderson v. Creighton,* 483 U.S. 635, 640 (1987) ("[To overcome qualified immunity, t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."*)*. "Thus if a reasonable official would not have understood that his conduct violated Plaintiffs' constitutional rights. . . [they] must" be granted qualified immunity. *Estrada v. Rhode Island,* 594 F.3d 56, 63 (D.R.I. 2010).

At its heart, the doctrine of qualified immunity is designed to strike the classic balance between freedom and security. *See Pearson v. Callahan,* 555 U. S. 223, 231 (2009) (noting that qualified immunity balances "the need to hold public officials accountable when they exercise

power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably"). The Court has recognized that when an officer is impeded by the threat of financial liability from doing that which a reasonable officer would believe is legal and necessary to seize criminals, the harm done to society in the case of close constitutional questions outweighs the harm done to the individual whose rights are marginally violated. *Id.*

As the Court is aware, the starting point in any claim for qualified immunity is the well-settled, two-part standard.[2]  The Court first decides whether the facts alleged or shown by the Plaintiff make out a violation of a constitutional right. *Maldonado v. Fontanes, 568 F.3d at 269.* If the Court answers yes to this first question, then the Court moves on to determine whether the right was 'clearly established' at the time of the defendant's alleged violation. *Id.*  However, for judicial economy's sake, the Supreme Court has granted lower courts the discretion to "put to the side" the first step of this analysis and move on to determine whether the claimed constitutional right is clearly established. *Pearson,* 555 U.S. at 236 (while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory).

Whether a right is clearly established involves two aspects: (1) "the clarity of the law at the time of the alleged civil rights violation" and (2) whether, on the facts of the case, "a reasonable defendant would have understood that his conduct violated the Plaintiffs' constitutional rights." *Id.*; *See also Anderson v. Creighton,* 483 U.S. 635, 640 (1987) ("[To overcome qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right"). "[I]f a reasonable

---

[2] The standard at times has been identified as a three-prong analysis because the "clearly established" standard requires a two (2) step analysis.

official would not have understood that his conduct violated Plaintiffs' constitutional rights. . . [they] must" be granted qualified immunity.  *Estrada* at 69.

To be clearly established, the contours of this right must have been "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard,* 134 S. Ct. 2012, 2023 (U.S. 2014). *"*In other words, 'existing precedent must have placed the . . . constitutional question beyond debate.'" *Id. quoting Ashcroftv.al-Kidd,* 563 U. S. 731, 735 (2011). The First Circuit has thus cautioned that although whether a constitutional right is at issue may be addressed in a generalized sense, ***when determining whether the right is clearly established, the "inquiry must be undertaken 'in a more particularized, and hence more relevant, sense***.'" *Hunt v. Massi,* 773 F.3d 361, 367-368 (1st Cir. 2014) *citing Saucier v. Katz,* 533 U.S. 194, 201-02001 (2001). See *also al-Kidd,* 536 U.S. at 735 ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality").  In short, "use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus ***police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.***" *City of Escondido v. Emmons*, 586 U.S. ___ (2019)(per curiam), slip op. at p. 5 (emphasis added).

Applying this standard, the First Circuit has noted that "[t]he law does not expect a public official, faced with the need to make an objectively reasonable real-world judgment, to anticipate precisely the legal conclusions that will be reached by a panel of federal appellate judges after briefing, arguments, and full-fledged review." *Savard v. Rhode Island,* 338 F.3d 23, 30 (1st Cir. R.I. 2003) *citing Wilson,* 526 U.S. at 617.  "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct. The unlawfulness must be apparent."

*McCullough v. Wyandanch Union Free School Dist.,* 187 F.3d 272, 278 (2d Cir. 1999) (citation omitted).

Here, the Plaintiffs have wholly failed to make a claim for constitutional violations. It is clear that the Plaintiff had no right disobey lawful orders, to continue to interrupt and intervene as the officers were performing their traffic accident investigation, nor to predicate her compliance with lawful orders with the officers' compliance with **her** directives. In *DeFusco v. Brophy*, the Court held that "… in certain circumstances, the spoken word can be just as effective in impeding an officer in the discharge of his duty as if the orator had grappled with the officer." *DeFusco v. Brophy*, 112 R.I. 461, 311 A.2d 286 (R.I. 1973). Here, the Plaintiff's verbal tirade, physical intrusions, and failure to remove her vehicle impeded the officers' ability to clear a scene, making Officer White's decision to arrest the Plaintiff reasonable in light of the circumstances.

Similarly, neither a leg sweep nor handcuffing rise to the level of force necessary to make out a constitutional violation, but rather are standard police practices in detaining and removing disorderly, obstructive persons from a dangerous highway. Summary judgment is appropriate here.

### B. The Negligence Claims

#### 1. <u>Counts VII and VIII: Negligence and Negligent Infliction of Emotional Distress</u>

Plaintiffs have also asserted claims against all parties sounding in negligence. The law is abundantly clear that plaintiff cannot sustain a negligence claim "because it effectively merges with the excessive force claim". *Mucci v. Town of North Providence,* 815 F. Supp. 2d 541, 548 (D.R.I. 2011). A plaintiff may not advance claims of excessive force and negligence predicated

on identical facts, as in the case at bar. *Id.,* and cases cited therein. The claims against White and Souza sounding in negligence must be dismissed.

### 2. *Count VII: Negligent Hiring Training and Supervision*

Count VII[3] (counts 117 and 118) sets forth a state law claim against Moynihan and the Town of South Kingstown Police Department for negligent hiring, supervision and training of its officers. Apart from the obvious point that summary judgment on the constitutional illegal seizure claims and their state counterparts will preclude liability on the hiring and supervision counts, the claims are ***wholly devoid of merit*** and require entry of summary judgment irrespective of the outcome of the seizure/force claims.

The claim against South Kingstown, and Moynihan individually, is convoluted, but premised upon the plaintiff's theory that:

• White should have been flagged as an aggressive police officer and provided with additional use of force training prior to his interaction with Hall;

• That the South Kingstown Police Department's loss of accreditation in 2024 is evidence of inadequate training and supervision; and

• In addition to *Monell* liability, Chief Moynihan is individually liable for inadequate training of White.

See Plaintiff's Supplemental ATI, Exhibit C.  The plaintiffs' argument in this regard is both legally and factually unsupportable.

---

[3] Count VII fails to include any factual allegations as to Officers White or Souza, despite the notation that a claim of negligence is being asserted against all defendants.

### a. *The Negligent Hiring, Training and Supervision Claim Against South Kingstown is Without Merit*

First, the Plaintiff's expert "opinion" as to inadequate hiring, training and supervision is built upon an embarrassingly faulty (and false) factual predicate. Plaintiff's expert designation, as set forth in her Supplemental ATI (Ex. C) reads, in pertinent part:

> Matthew White's personnel file, as provided by the SKPD in response to a Request for Production of Documents, contains three (3) separate Incident Reports concerning Officer White and his "Response to Resistance." All these incidents occurred in the fall of 2022, approximately six (6) months or less before his interaction with Claire Hall. Although the Incident Reports indicate that Officer White was not disciplined for his involvement in the three "Responses to Resistance, a report of "Response to Resistance" is an identifier of potential excessive force used in submitting someone prior to or in an arrest situation.

Setting aside for the moment that "potential identifier" for which no discipline was warranted cannot, without more, serve as the basis for a hiring, training and supervision claim, the opinion has bigger issues. In his deposition, Mr. Mancini **admitted that he had not actually reviewed Officer White's personnel file nor the "Response to Resistance Reports"** on which his opinion relied, despite the fact that he testified that the way to verify whether there had been misconduct was to review the reports. Mancini deposition, Exhibit D, pp. 14,63.

He admitted that, for each of the three matters, he was unaware of the type of force used, who used the force[4], whether the force was appropriate, whether it was the least amount of force used to achieve a lawful objective. Mancini deposition, Exhibit D, pp. 62-64. He also admitted that the matters did not result in discipline to White and were deemed to be in compliance with Rhode Island General Laws and South Kingstown Police Department policy. Ex. D, p. 71.

---

[4] Mancini admitted that Response to Resistance reports are routinely filed by all officers at the scene irrespective of who used the force.

The second leg of the flimsy argument that White should have been "flagged" as a potentially problem police officer was that he had been counseled in the past for being "aggressive".

> Officer White's personnel file also contained a notation by a supervisor indicating that Officer White was an "aggressive" police officer. Further, Officer White's file also contained an admission by Officer White that he lost his cool in dealing with a belligerent suspect. Again, this occurred prior to Officer White's interaction with Claire Hall. Officer White was disciplined by being "counseled" for that final interaction.

The incident in which White lost his cool with a belligerent suspect was in 2019 (White depo., Exhibit E at pp. 154-156, and well beyond what even Mancini deemed to be relevant to a "pattern" of problematic behavior so as to require retraining.  Ex. D at 83, 85 (3 years with no discipline for aggressive policing or excessive force does not require early intervention or retraining).   But more importantly, Mancini never reviewed the records to determine whether White *actually received* the training that he opined was necessary, a predicate to recovery on the negligent training and supervision claim.  If he had, he would have learned that White received at use of force retraining on a yearly basis. White depo, Ex. E at 157-160.

> The totality of the circumstances in Officer White's file, as listed above, all of which occurred before Officer White's interaction with Claire Hall on February 9, 2023, leads me to believe to a reasonable degree of certainty in the field of police policies, practices and procedures, and use of force*, that none of Officer White's supervisors, including the Chief of Police, had reviewed his file to discern a pattern of aggressive policing that should be considered unwarranted.*

> Officer White's file shows sufficient indicia of an aggressive police officer who needed retraining prior to his interaction with Ms. Hall. All the "Response to Resistance" notations in Officer White's file occurred while Chief Moynihan was the Chief of the South Kingstown Police Department. None of Matthew White's supervisors, including Chief Moynihan, adequately intervened *when presented with signs of his aggressive behavior that required retraining.* Had that occurred, within a reasonable degree of certainty in the field of police practice, policies, and procedures, Matthew

20

White's interaction with Ms. Hall would have de-escalated, instead of escalated the motor vehicle accident scene, and Ms. Hall would not have been arrested.

In light of Mancini's deposition, this disclosure is so erroneous as to warrant being stricken. Mancini knows that the Response to Resistance incidents – which he did not know even involved any force by White himself – were reviewed and deemed in compliance with South Kingstown policy and Rhode Island law. He didn't bother to read them, so he has no evidence to suggest that the findings were inappropriate.  Mancini's failure to review White's personnel file, disciplinary history, Response to Resistance reports, and training history leave him without an adequate factual foundation to render the opinion as to his need for retraining.  Instead, Mancini fills those holes with utterly erroneous factual foundation, e.g., his mystifying belief that White had prior "IA" investigations and multiple disciplines for aggressive policing. Again, false.

In sum, Mancini admitted that he had no information that White had been disciplined for using excessive force or aggressive behavior in the 2–3-year period prior to Hall's arrest. Ex. D, pp. 82-82.  The truth is, as plaintiff well knows, Officer White was counseled in 2019 for using the term "asshole" with a belligerent suspect.  He has never been disciplined for using excessive force.

The trial judge has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert I*, 509 U.S. at 597, 113 S. Ct. at 2799, 125 L.Ed. 2d at 485.  As an integral part of the foundation "an expert's opinion must be predicated upon facts legally sufficient to form a basis for his conclusion." *Gorham v. Public Bldg. Auth.*, 612 A.2d 708, 717 (R.I. 1992 ) *citing  Alterio v. Biltmore Constr. Corp.,* 119 R.I. 307, 312, 377 A.2d 237, 240 (1977).  The opinions presented herein are without adequate factual foundation and may not serve to prop up a fundamentally infirm hiring, training and supervision

claim.

### b. Liability as to Moynihan

Separately, there is no basis for liability of Moynihan for failure to train or supervise (the hiring claim is inapplicable to Moynihan as White was hired before Moynihan's tenure[5]), as the claims against Moynihan are indistinguishable from those against South Kingstown.

A complaint which makes no showing that the complained of activity is other than that which the official is required to undertake in the pursuit of the municipality's business, is in reality, one against the official in his official capacity and, therefore, against the municipality. *See Pelumi v. City of Woonsocket,* C.A. No. PC 10-3875, p. 2 , FN 2 (R.I. Super. Jan 12, 2015) (police officer sued as "duly appointed employee" and "acting police officer of the City of Woonsocket" deemed to be sued in his official capacity). It is well established that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity." *Pelumi, quoting Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (emphasis in original).

The Rhode Island Supreme Court addressed this issue with respect to suits against municipal employees in which capacity is not alleged.

> Capacity is critical to the damage award because in an official-capacity suit damages are limited by the Government Tort Liability Act (Act), G.L.1956 chapter 31 of title 9. *See Capital Properties, Inc. v. State,* 749 A.2d 1069, 1081 (R.I.1999) (discussing that a suit against a state official acting in his official capacity constitutes a suit against the state) *(citing Will v. Michigan,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). However, there is no limitation on damages in an individual capacity suit. *See Pridemore v. Napolitano*, 689 A.2d 1053, 1056 (R.I.1997) (per curiam) *(quoting Hudson v. Napolitano*, No. 86-291-A. (R.I., filed May 20, 1987) (unpublished order) (holding that a police officer's "individual [ ] liability for his own tortious action was not controlled by the limit of liability of the municipality")).

---

[5] "Defendant Matthew C. Moynihan has been South Kingstown Chief of Police since July of 2022".  Plaintiff's Complaint at Par. 5.

*Feeney v. Napolitano*, 825 A.2d 1, 5 (R.I. 2003).

While it is clear that a governmental actor may incur individual liability for neglect of his duties owed individually (e.g., observing the rules of the road), it is patent that there can be no individual liability for neglect of an official duty.  Consider the case of *Hardin v. Straub,* 954 F.2d  1193 (6th Cir.1992), involving a suit against a prison official for a recommendation  he made in the course of exercising his responsibilities pursuant to his position as a classification director.

> Here, Plaintiff purports to sue Defendant in his "individual" capacity, however, he has failed to make any showing to substantiate that the Defendant was acting in other than his official capacity. A complaint which makes no showing that the complained of activity is other than that which the official is required to undertake in the pursuit of the State's business, is in reality one against the official in his official capacity and, therefore, against the State.

*Hardin,* 954 F.2d at 1199.  Furthermore, the Complaint does not allege Moynihan was acting in an individual capacity, as it does with respect to White and Souza (Complaint at Pars. 5-9) but instead notes that he is sued "in his capacity as police chief of the Defendant". Compl. at Par. 9.

As both the language of the Complaint and the nature of the allegations establish that Moynihan is sued in his official capacity, the Complaint sets forth a claim against the Town itself and not Chief Moynihan, who is not a proper party to the case.

## C.  The *Monell* Claim (Counts I, II, III, IV[6], V, VI, IX and X)

Plaintiffs allege that the deprivation of Claire Hall's right to be free from unlawful arrest and prosecution was as a result of he "policies and practices" of the South Kingstown Police Department (Complaint, par. 132), and the failures of South Kingstown and Chief Moynihan to train, direct, instruct and oversee their police officers (Complaint, par. 134).

Under *Monell*, it is established that a local government cannot be held liable under §1983 on a *respondeat superior* theory.  *Monell v. Department of Social Services of New York,* 436 U.S. 658, 691-92, (1978).  Municipal liability under 42 U.S.C. § 1983 is permissible only where the unconstitutional actions of municipal actors were taken in accordance with an overall policy or custom of the municipality. *Graff v Motta*, 695 A.2d 486, 494 (R.I. 1997) (and cases cited therein, including *Monell*).  It is the plaintiff's burden to demonstrate that a particular police action is the result of a city policy. *See Wilson v. City of Boston.* 421 F.3d 45, 59-60 (1st Cir. 2005).

In order to establish municipal liability under §1983, "the custom or practice [must be] so well-settled and widespread that the policy making officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end it." *Walden v. City of Providence.* 596 F.3d 38, 57-58 (1st Cir. 2010) (*quoting Bisbal-Ramos v. City of Mayagilez.*467 F.3d 16, 24 (1st Cir. 2006)). Hall has made no such showing in this case, as her accusations and claims of damages focus solely upon the conduct of the individual police officers.

---

[6] Seemingly styled as a state-law claim for "excessive force and police brutality", Defendant include the count as a claim for constitutional violations under color of law pursuant to 42 USC Section 1983, as there is no cognizable cause of action for police brutality under Rhode Island law separate and apart from assault and battery.

Additionally, apart from the claim of negligent hiring, training and supervision, *supra*, there is no evidence of such a policy or custom by the Town of South Kingstown that is unconstitutional or otherwise legally infirm. Plaintiff's police expert conceded in his deposition that he had no opinion relative to the weakness, illegality, or other infirmity as to South Kingstown Police Department policies. Exhibit D at p. 89.

Summary Judgment is appropriate as to Count X of Plaintiff's Complaint (Respondeat Superior) as well as the municipal claims arising out of constitutional violations or intentional acts of the officers as alleged within Counts I, II, III, IV, V, VI and IX. *Cruz v. Town of North Providence*, 833 A.2d 1237, 1238 (R.I. 2003) (where misconduct is not the product of a municipal practice or policy, judgment must enter in favor of the municipality).

### D.  Access to Public Records Act (Count XI)

It is established that the purpose of APRA is to support the "promotion of the free flow and disclosure of the information to the public." *Dare v. Gannon*, 819 A 2.d 657 (R.I. 2008); citing *Providence Journal Co. v. Sundlun*, 616 A.2d 1131, 1134 (R.I. 1992). However, it has also been concluded that "the Legislature did not intend to empower the press and the public with carte blanche to demand all records held by public agencies." *Direct Action for Rights and Equality v. Gannon*, 713 A.2d 218 (R.I. 1998) citing *Providence Journal Co. v. Sundlun* 616 A 2.d 1131, 1134 (R.I. 1992). APRA only provides a remedy to those who have been wrongfully denied access to public records. *Re New England Gas Co.,* 842 A. 2d 548 (R.I. 2004).

Under R.I. §38-2-8, if a person is denied an APRA request, the steps to appeal are explicitly outlined. A person may petition the chief administrative officer, as well as the Attorney General, for a review. However, if those remedies are not preferable or sufficient, §38-2-8(b) explicitly states:

> Nothing within this section shall prohibit any individual or entity from *retaining private counsel for the purpose of instituting proceedings for injunctive or declaratory relief in the superior court of the county where the record is maintained.*

Here, the APRA count is fundamentally erroneous in that a.) James Hall never made an APRA request and b.) Claire Hall filed the within action without availing herself of the limited remedies set forth in the enabling act. Specifically, Plaintiffs' Complaint alleges:

> Out of concern for the public interest and to contribute significantly to public understanding of the operations or activities of the South Kingstown Police Department, the Plaintiffs, *Claire Hall and James Hall, made requests for public records, to which the Defendants responded fraudulently and in bad faith*.

See Plaintiffs' Complaint, Paragraph 137.

First, by Claire Hall's own admission, she was the only plaintiff - under a variety of pseudonyms - who made any APRA requests relating to this incident. Her husband made no such request. Plaintiff's Deposition, Exhibit A, page 141. Furthermore, Plaintiff Claire Hall did not exhaust administrative remedies, nor did she seek relief in Washington County Superior Court through declaratory or injunctive relief, as outlined in the statute. Plaintiff's Deposition page 138. Rather, Plaintiff Claire Hall simply amended her scope of requested records after receiving the initial estimates of costs, until she paid an estimate and received a tranche of records.

There was no denial to Plaintiff Claire Hall's APRA requests. Moreover, even if the Court were to find the estimate of charges for the APRA request to be to be disproportionate to the request, the only remedy afforded under R.I. General Laws §38-2-3. APRA was intended to provide the public access to records, and in the event that the ability to access those records is

hindered, proper protocol is explicitly outlined. As the Plaintiffs did not follow such protocol, the Defendants are entitled to judgment as a matter of law.

## CONCLUSION

As there is no genuine issue of material fact, the Defendants are entitled to summary judgment as a matter of law as to Claire Hall and to James Hall's derivative claims for loss of consortium.

Defendants,
By their attorney,

/s/ Melody A. Alger
Melody A. Alger, Bar No. 4585
Alger Law LLC
1300 Division Road, Suite 206
West Warwick, RI 02893
Tel: (401) 277-1090
Fax: (401) 277-1094

## **CERTIFICATION**

I hereby certify that on the 15th day of January 2025, this document was filed electronically and is available for viewing and downloading from the ECF System and a copy was served by electronic mail to the following counsel of record:

Todd White, Esq.

/s/ Deana Peters