CLAIRE HALL and JAMES HALL,

    *Plaintiffs,*

        v.

TOWN OF SOUTH KINGSTOWN, SOUTH KINGSTOWN POLICE DEPARTMENT, through the Town Manager James Manni; POLICE CHIEF MATTHEW C. MOYNIHAN; POLICE OFFICER MATTHEW WHITE, and POLICE OFFICER ANTHONY SOUZA,

    *Defendants.*

C.A. No. 1:23-cv-00359-MSM-PAS

## PLAINTIFFS' STATEMENT OF DISPUTED FACTS[1]

8.  Officer Souza advised Ms. Hall that he needed to clear the scene. Ms. Hall remained on the scene.

    **Dispute:** Ms. Hall testified that regarding Officer Souza "I don't know if he even told me to move my car." (Hall's testimony as **Exhibit 1** at 95:25) She then said, "We need to clear the scene." (**Exhibit 1** at 96:1) She did not testify to whom he said that, however. There is no dispute that Ms. Hall remained on the scene.

20. After Officer White asked Limoges to have a seat at the center of the median and asks whether Limoges is ok, Hall came over and said "Do you want to talk to his father? Here, why don't you talk to his father", while waving her phone in White's personal space.

    **Dispute:** Based upon the video from the body worn camera, Ms. Hall disputes the characterization of her waving her phone in White's "personal space". Plaintiff does not dispute that Hall offered her phone to Officer White more than once.

23. Plaintiff argued with White, stating that she was an attorney and Mr. Limoges was a minor and that he "needed to tell her where [Limoges] was going to be".

---

[1] For ease of review, Plaintiffs have included what Defendants wrote in their "Statement of Undisputed Facts" with the Plaintiffs' Dispute and the basis thereto.

**Dispute:** Based upon the video from the body worn camera, Plaintiff disputes the characterization of her arguing with White. Plaintiff was advocating for the well-being of Van Limoges and seeking information to tell Van Limoges' father.

24. Claire Hall was not, in fact, Limoges' attorney.

**Dispute:** Based upon the video from the body worn camera, Claire Hall never indicated that she was Limoges' attorney or anybody else's attorney. Claire Hall simply said she was an attorney.

28. Hall ignored White's orders, loudly demanding "what should I tell his father?".

**Dispute:** Ms. Hall disputes that she ignored Officer White's orders. Based upon the video from the body worn camera, she was advocating for prioritizing the well-being of the minor accident victim and obtaining information to tell his father. She asked Officer White again about what she should tell Van Limoges' father.

30. Hall did not comply, but instead held her cell phone directly in front of Officer White's face saying "Tell him. Here, take it!".

**Dispute:** Based upon the video from the body worn camera, Ms. Hall disputes the characterization of this alleged fact. Ms. Hall did offer Officer White her cell phone, but did not do so directly in front of his face.

31. Officer White then attempted to place the Plaintiff Claire Hall under arrest, but she resisted arrest, screaming "don't touch me!" and struggling to get away.

**Dispute:** Ms. Hall testified that she was unaware that she was being placed under arrest at the time and therefore could not be resisting arrest. (**Exhibit 1** at 128: 19-21) She was struggling because she believed she was being assaulted.

33. Once the handcuffs were on Hall, she was helped up and brought to a police cruiser while screeching, cursing and causing a commotion, at one point screaming "this man is beating the shit out of me!" At the time, Officer Souza was gently escorting her to the cruiser.

**Dispute:** Based upon the video from the body worn camera, Ms. Hall disputes that Officer Souza was "gently escorting her to the cruiser."

35. Several months later, the charges were dismissed without prejudice under R.I. Gen. Laws §12-10-12, requiring, inter alia, Hall to be of good behavior and keep the peace for one year in order to avoid the charges being resurrected.

**Dispute:** Ms. Hall's charges were dismissed on "Not guilty" filings which is more specific than the general dismissal under R.I. Gen. Laws §12-10-12. (See attached **Exhibit 2**).

36. Each of the orders to Hall to move her car as set forth herein was a lawful order.

**Dispute:** Based upon the video from the body worn camera, Ms. Hall disputes the characterization of demands by officers for her to move her car before determining the well-being of the minor accident victim as a "lawful order". This is a question of fact for the jury to decide based upon the totality of circumstances.

37. Each of the orders to Hall to get into her car as set forth herein was a lawful order.

**Dispute:** Based upon the video from the body worn camera, Ms. Hall disputes the characterization of demands by officers for her to move her car before determining the well-being of the minor accident victim as a "lawful order". This is a question of fact for the jury to decide based upon the totality of circumstances.

40. Claire Hall resisted arrest.

**Dispute:** Based upon the body worn camera video and **Exhibit 1** (128:19-21), Ms. Hall did not think she was being arrested. She believed she was being attacked. She was grabbed by the wrists and taken to the ground having not committed any criminal violation. Therefore, her resistance was not to an arrest, but her resistance was to what she believed to be an assault.

Plaintiffs,
CLAIRE HALL and JAMES HALL
By their Attorney,

*/s/ Todd D. White*
Todd D. White (#5943)
ADLER POLLOCK & SHEEHAN P.C.
100 Westminster Street, 16th Floor
Providence, Rhode Island 02903
Tel: 401-274-7200
Fax: 401-351-4607
Email: twhite@apslaw.com

Dated:   February 13, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of February 2025, a copy of this document was served via email on the following:

Melody A. Alger, Esq.
Alger Law LLC
1300 Division Road
Suite 206
West Warwick, RI 02893
malger@algerlaw.com

/s/ Todd D. White

4925-3009-1289, v. 1

# EXHIBIT 1

Page 85

affairs at URI, Dan Graney.

Q. I take it you didn't go to the hockey tournament?

A. I did.

Q. You did?

A. I had to. I was in charge of all of the food for kids for all weekend.

Q. Okay. We'll get into that. As you are travelling north on Route 1, it is my understanding that you noticed the scene of a car accident ahead; is that correct?

A. Correct.

Q. And tell me what drew your attention when you first noticed; tell me everything you saw?

A. I was in the left-hand lane, and I was speaking to my husband on Bluetooth at the time, and I saw that there was an accident ahead, and I said to my husband: Oh, my goodness. There is an accident. And I have always been somebody to help, if there is help needed.

So as I am getting closer, I said to my husband: Oh, my gosh, it is kids, and I noticed that Van Limogues (phonetic), who I didn't know it was Van at the time, was -- looked like he was in real grave distress.

He was sort of frantically walking. He had blood on his leg. He was shaking.

Page 86

Q. You saw this from your car?

A. I saw it when I pulled -- when I said to my husband, oh, it is kids.

Q. Did you pull over at that point when you said oh, it is kids?

A. Yes.

Q. Is it fair to say that you made this observations of Van that you described after you stopped your car?

A. I would say that the blood on the leg, yes, after I stopped the car, but what appeared to be disorientation and wandering was as I was approaching.

Q. But after you made the decision to pull over; is that fair?

A. Well, no -- I mean, I was -- it all happened pretty quickly, but I was in the left lane coming upon the accident, and Van's car was in front of me.

So I think I made the decision all at the same time. So I pulled my car over on to the grass, put my hazards on, intentionally created a situation whereby the kids were safer with my car there, because the -- I said kids, but Van and the URI student were on the grass, and so I put my car in a position so nobody would drive up into the medium on to them, and I put my hazards on. I turned my car off, and I got out, and

Page 87

walked up, and as I was approaching, I could see Van was bleeding.

Q. And you discontinued the phone conversation with your husband at that point?

A. I said, Oh, my goodness. It is kids. I'll call you back, and hung up.

Q. At the time that you got out of your car did you recognize Van Limogues?

A. No.

Q. At some point, did you recognize him as somebody you might know?

A. No. I imagined that since he was in South Kingstown, and he looked around the age of my children, that it was a very good possibility that I would know him, but I didn't specifically know Van. We sorted that out after the fact. And it turns out that Van's brother and my daughter were really good friends in high school.

Q. Where did your daughter go to high school?

A. Narragansett.

Q. And did Van go to Narragansett as well?

A. Yes.

Q. And his brother went there as well?

A. Yes.

Q. I am going to ask you, and I think I know the answer because we have gone over your educational

Page 88

history, but I want to ensure: You do not have any medical training; is that correct?

A. I mean, I have taken CPR classes and first aid classes, and I was a lifeguard.

So that's the extent of any medical training.

Q. So you certainly have no training in law enforcement or accident response, or anything like that; correct?

A. I mean, through my work, because I have been involved in so many instances that involve, you know, assault and sexual assault, I have a good knowledge about that type of information, but I don't -- I didn't specifically attend the police academy, or anything like that.

Q. Right. As you got out of your car, who did you first interact with when you went to the scene?

A. So, I got out of my car, and I was sort -- I came upon both of them. The URI student had what appeared to be liquid all over his sweatshirt -- well, the first thing I said was have you called 9-1-1, and they said they had. Then he looked --

Q. And that was Van Limogues who had called 9-1-1; correct?

A. I didn't know at the time. They just said, yes, we called 9-1-1. So I didn't know who called.



Page 89

Q. Let me interrupt you. Have you since become aware that Van Limogues called 911?

A. Through discovery, yes.

Q. Go ahead.

A. So, I approached, and the URI student, his sweatshirt was wet. So, the first thing I said to both of them: Are you okay, and then I asked what was on his sweatshirt, because he had a maroon sweatshirt on, and I wanted to make sure it was not blood, or anything like that. He said it was water. That, upon impact, he had water in the car that had spilled on him. He said that he felt like he was okay.

Q. That was the URI student?

A. The URI student felt like he was okay. Van was in a state of distress. He was shaking, bleeding, confused, asking me if I thought he was going to die.

He told me he hit his head, that he was really, really worried, because he knew that when kids hit their head, bad things happen. Did I think he was going to be okay. I said, absolutely. I think you are going to be okay. But let's just get you to sit down.

So I sat him down on the grass in a place that I knew was protected by my vehicle, and I then I sat with him, and I was simply trying to comfort him, because he was so worried about his physical safety and health, and

Page 90

so I was holding his legs, like, we were sitting across from each other, and I had his legs, and I was sort of doing a concussion test with the pupils, but like, I wasn't really doing it. It was more that I was doing it to keep him calm, and to be able to say you are okay. It is going to be okay. I looked at his cut on his knee. And I said, I think it is fine. You definitely have to go to the hospital, but I am sure you are going to be fine.

And the URI student was lovely. He was so kind to Van. He was so nice. He was worried about Van. He was not mad at Van for hitting him, which happens in accidents. He was just such a kind kid, and so we were both looking out and taking care of Van.

Q. I am going to ask you a couple of questions about what you have testified to. You have testified that Van said to you, am I going to die?

A. Yes. He specifically said that. Do you think I could die from this?

Q. Oh, do you think I could die from this?

A. Something like that. Yes. Do you think I could die from this because I hit my head? Something like that.

Q. You were aware, having received discovery, that Van has never made mention of that comment?

Page 91

A. Van hit his head. Van was scared. I don't know what Van said in his testimony. I am telling you what happened at the scene.

Q. I am just asking you, because you know having received the discovery in this case. You reviewed his statement; right?

A. Yes, I did.

Q. You are aware that he makes no mention of any such statement; correct?

A. Correct.

Q. And that he has indicated that in response to questions as to whether or not he was okay, he said that he thought he was okay?

A. He did not think he was okay at the time. Now that might be his recollection, or what he said in a police station when he was nervous. He was so afraid of the police because of what had happened, and I know that from a fact because I saw him at the hospital after the incident, and he was traumatized about what had happened with the aggressiveness of the police.

So anything he said in the police station, I am sure he was very nervous, but I can tell you emphatically that one of the things he questioned was, was this something that caused him to die.

Q. Okay. And when is the first time you had any

Page 92

interaction with either of the police officers?

A. So Van and I were sitting on the ground, like I said, the URI student was helping. We were comforting him. He was shaking. And I helped him call his dad, and then while I was on phone with the father, Officer Souza aggressively walked up.

Q. Let me ask you about the call to his father; how did that come about?

A. The call to his father?

Q. Yes.

A. Van, and I will tell there were inconsistencies with what Van said with respect to how it happened.

How it happened was Van's phone was in his pocket. I think he had called 9-1-1, and he put his phone in his pocket, in his right pocket of his pants, and he went to try to get it out, and we were seated, and he was shaking so much that he could just not get his phone. I said, it is okay. We can use my phone.

So I handed him my phone. He dialed his dad. His first attempt -- he struggled with the first call for some reason. I don't know why, but he did dial his dad, and it didn't go through, or he you hung up on his dad. I don't know.

The second call went through. He talked to his dad for a brief period, a very brief period of time, and



Page 93

then he handed me the phone, because the dad said is there an adult there.

So then I took the phone, and I began my conversation with Mr. Limogues.

Q. And my understanding is that he had called his dad initially with his telephone, but that it didn't go through?

A. He never called his dad with his telephone, as far as I know. I don't believe he ever called. He was so injured and traumatized and nervous at the scene, I don't think he remembers anything, really, because he was not using his phone. His phone was in his pocket.

He used his phone originally, I guess, to call 9-1-1, but when I was interacting with him, his phone was in his right packet.

Q. So from my understanding from Mr. Limogues that his battery was at one percent, which is why he used your phone?

A. I don't know that to be true.

Q. You were on the phone with his dad. Tell me about that conversation before Officer Souza arrived?

A. I told him that his son had been in a car accident, that he appeared to be okay, but that he had hit his head on the windshield, cracking the windshield, and that he was bleeding from his leg, but that he was

Page 94

walking and talking and responsive. But that he was very scared.

And so his father said I am in Portsmouth, which is like 40 minutes away. Do you know where I should drive to, because they probably still will not be at the scene in 40 minutes.

And I said because he has a traumatic -- because he could have a traumatic brain injury, that they usually take you to Rhode Island Hospital, if you have a traumatic brain injury, but maybe they would take him to South County.

It never even dawned on me in a million years that they would put a kid who had just broken the windshield with his head in a car to drive, so I said I will let you know as soon as I know which hospital they are taking him to.

My experience would be that they would have kept him stabilized until the ambulance arrived, then they would have transported him to the hospital, not put him in a car. So, I was saying that to the father.

But whey they started to put him in the car, I just said -- you can hear me on the video. He should not be driving. I could not understand what was going on. Why in the world would they be putting him in a car to drive when he smashed his head on the windshield. It

Page 95

didn't make any sense.

Q. So you are on the phone with his father, and then Officer Souza arrives?

A. Yes.

Q. And I think you testified that he came in and was combative?

A. So combative, immediately combative.

Q. Tell me what you mean by combative? What did he say or do initially that is not on that video that you describe as or you would characterize as combative?

A. He immediately walked up -- even his demeanor was aggressive. He was not walking. He would not shake -- the URI kid approached him, tried to shake his hand. He would not shake his hand. He scared Van.

So Van jumped up because his demeanor was so like awful that Van jumped up and stood up, when he should have been still on the ground, because the officer was so, like, he was just aggressive off the bat. His demeanor. He just was annoyed and wanted to get the scene cleaned up.

So he approaches the scene, and his demeanor, like, it was radiating aggression, and so Van jumps up and stands up. And then we start into this weird interplay of the officer telling me to move my car and -- or I don't know if he even told me to move my car.

Page 96

We need to clear the scene. And starting to put Van in the car to drive. Never, ever, ever asked him if he was okay. Never checked on his condition. Never did anything at all that would normally happen at the scene of a car accident with injury. Like, it was not making any sense.

Q. I am going to ask a number of different questions about this. So, I am trying to get a handle on what was so combative about Officer Souza, and I am hearing that he would not shake hands with the URI student; correct?

A. That is one of the many things about his demeanor.

Q. I am going to get to that. So that is one of the things; right?

A. You asked me, and I said yes. That is was one of the things about his demeanor.

Q. And that he scared Van?

A. Yes. He absolutely scared Van.

Q. And you knew this because Van jumped up?

A. Yes.

Q. How did you know that Van was scared? Did he say I am scared?

A. No. It was not that. It was just, you could tell he was reacting to the demeanor of the officer.



Page 125

of Officer White's car.

MR. WHITE: Okay.

MS. ALGER: And I am going to try to get my computer to cast here. If not, I'll show it to you on laptop. But this will be easier to do.

MR. WHITE: Okay.

MS. ALGER: I believe -- it is not coming up, and I hope it is not coming up in Capital Wealth's conference room.

THE WITNESS: That is not funny, and I hope it is not, either.

MS. ALGER: The video is not playing. I'll try it one more time. If not, we'll look on my computer.

(PAUSE)

MS. ALGER: It is definitely not going to work. Sometime it does. Sometimes it does not. It works better when I have a hard wire.

(VIDEO PLAYING,
DEPONENT WATCHING VIDEO
FROM LAPTOP COMPUTER OF MISS ALGER;
DEPONENT COVERS HER HEAD ON THE
CONFERENCE ROOM TABLE, CRYING)

By Attorney Alger:

Q. Okay. I am going to ask some questions about

Page 126

the video, and that's the reason --

A. You have to understand, this is very traumatizing.

Q. I understand, and that is why you can take a break if you need to take a break, but since I am going to ask you some questions about the video, it is really important that you look at it.

(VIDEO RESUMES,
COUNSEL AND DEPONENT WATCHING)

A. This is what happens when you stop to help someone. It ruins your life.

Q. Okay. I am going to ask you a series of questions about this particular video.

A. If you are going to ask me questions about the video, can we watch it as you ask me the questions. I thought you were going to point things out.

Q. I am going to ask you questions --

A. I thought --

MR. WHITE: Give the best memory you have. If you do not remember, that's totally fine.

Q. I just wanted you to have the opportunity to see it when I ask you some of these questions. I counted six times that you were asked to -- or instructed to move your vehicle; do you disagree with that?

Page 127

A. I agree with everything that is on the video.

Q. Do you contend that that was a not a lawful order?

MR. WHITE: Objection. You can answer, if you can answer. I am objecting.

A. It was not a lawful order, correct.

Q. That is your contention, that that was an unlawful order on behalf of the police; correct?

A. Yes.

Q. And that they did not have the authority to order you to move your vehicle?

A. Yes.

Q. And that is because you had a legal duty under the Good Samaritan Statute; is that your contention?

A. It was an unlawful order.

Q. I am trying to understand why you believe that was an unlawful order?

A. Because I believe it was in violation of the law.

Q. And the law being the Good Samaritan Statute?

A. The order itself was unlawful.

Q. And I am trying to understand why you believe it was unlawful?

A. For a multitude of reasons, including the Good Samaritan Statute.

Page 128

Q. Is there any other laws that you can think of that on which you are basing your belief that that was an unlawful order?

A. Not off the top of my head, but I am not -- there may be.

Q. Okay. I am just trying understand what the basis of your belief is. That's all.

A. I understand.

Q. Would you agree that you were resisting arrest?

A. No.

Q. You do not agree?

A. No.

Q. Do you disagree that you were struggling?

A. I was being injured, correct.

Q. You were struggling?

A. No. I was being attacked, and injured.

Q. Were you struggling, whether or not in response to an injury or otherwise?

A. I was struggling physically and emotionally in the sense that I was being attacked. I did not know I was being arrested. I was being attacked.

Q. And you keep using the word attacked?

A. I was attacked.

Q. Were you punched?

A. I was attacked.



then he handed me the phone, because the dad said is there an adult there.

So then I took the phone, and I began my conversation with Mr. Limogues.

Q. And my understanding is that he had called his dad initially with his telephone, but that it didn't go through?

A. He never called his dad with his telephone, as far as I know. I don't believe he ever called. He was so injured and traumatized and nervous at the scene, I don't think he remembers anything, really, because he was not using his phone. His phone was in his pocket.

He used his phone originally, I guess, to call 9-1-1, but when I was interacting with him, his phone was in his right packet.

Q. So from my understanding from Mr. Limogues that his battery was at one percent, which is why he used your phone?

A. I don't know that to be true.

Q. You were on the phone with his dad. Tell me about that conversation before Officer Souza arrived?

A. I told him that his son had been in a car accident, that he appeared to be okay, but that he had hit his head on the windshield, cracking the windshield, and that he was bleeding from his leg, but that he was

walking and talking and responsive. But that he was very scared.

And so his father said I am in Portsmouth, which is like 40 minutes away. Do you know where I should drive to, because they probably still will not be at the scene in 40 minutes.

And I said because he has a traumatic -- because he could have a traumatic brain injury, that they usually take you to Rhode Island Hospital, if you have a traumatic brain injury, but maybe they would take him to South County.

It never even dawned on me in a million years that they would put a kid who had just broken the windshield with his head in a car to drive, so I said I will let you know as soon as I know which hospital they are taking him to.

My experience would be that they would have kept him stabilized until the ambulance arrived, then they would have transported him to the hospital, not put him in a car. So, I was saying that to the father.

But whey they started to put him in the car, I just said -- you can hear me on the video. He should not be driving. I could not understand what was going on. Why in the world would they be putting him in a car to drive when he smashed his head on the windshield. It

didn't make any sense.

Q. So you are on the phone with his father, and then Officer Souza arrives?

A. Yes.

Q. And I think you testified that he came in and was combative?

A. So combative, immediately combative.

Q. Tell me what you mean by combative? What did he say or do initially that is not on that video that you describe as or you would characterize as combative?

A. He immediately walked up -- even his demeanor was aggressive. He was not walking. He would not shake -- the URI kid approached him, tried to shake his hand. He would not shake his hand. He scared Van.

So Van jumped up because his demeanor was so like awful that Van jumped up and stood up, when he should have been still on the ground, because the officer was so, like, he was just aggressive off the bat. His demeanor. He just was annoyed and wanted to get the scene cleaned up.

So he approaches the scene, and his demeanor, like, it was radiating aggression, and so Van jumps up and stands up. And then we start into this weird interplay of the officer telling me to move my car and -- or I don't know if he even told me to move my car.

We need to clear the scene. And starting to put Van in the car to drive. Never, ever, ever asked him if he was okay. Never checked on his condition. Never did anything at all that would normally happen at the scene of a car accident with injury. Like, it was not making any sense.

Q. I am going to ask a number of different questions about this. So, I am trying to get a handle on what was so combative about Officer Souza, and I am hearing that he would not shake hands with the URI student; correct?

A. That is one of the many things about his demeanor.

Q. I am going to get to that. So that is one of the things; right?

A. You asked me, and I said yes. That is was one of the things about his demeanor.

Q. And that he scared Van?

A. Yes. He absolutely scared Van.

Q. And you knew this because Van jumped up?

A. Yes.

Q. How did you know that Van was scared? Did he say I am scared?

A. No. It was not that. It was just, you could tell he was reacting to the demeanor of the officer.



# EXHIBIT 2



# STATE OF RHODE ISLAND JUDICIARY

## SUPERIOR COURT

## ORDER FOR EXPUNGEMENT – FILING OF COMPLAINT

| State of Rhode Island<br>v.<br>**Defendant**<br>Claire Hall | **Case Number**<br>W3-2023-0099A | **Case Type**<br>Misdemeanor |
|---|---|---|
| | **District Court No.**<br>41-2023-00272 | |
| | **Bureau of Criminal Identification Number**<br>RI-@11851068 | |
| McGrath Judicial Complex<br>Washington County<br>4800 Tower Hill Road<br>Wakefield, RI 02879 | **Date of Birth**<br>10/3/1972 | |
| | **Law Enforcement Agency**<br>South Kingstown Police Department | |

| Charge | Disposition | Disposition Date |
|---|---|---|
| Obstructing Officer in Execution of Duty | Not Guilty Plea | 07/24/2023 |
| Resisting Legal or Illegal Arrest | Not Guilty Plea | 07/24/2023 |
| Disorderly Conduct | Not Guilty Plea | 07/24/2023 |

All statutory conditions having been met, the above-mentioned charge(s) which was placed on file in accordance with G.L. 1956 § 12-10-12(a) is hereby ordered expunged pursuant to G.L. 1956 § 12-10-12(c). All records relating to the above-referenced case shall be expunged and all index and other references to the case removed from public inspection, and notice of the expungement shall be provided to the appropriate parties pursuant to the standards set forth in G.L. 1956 § 12-1.3-3(c).

| Entered as an Order of the court on 8/13/2024 | **BY ORDER OF:**<br><br>*Budu C Oates*<br>BRENDEN T. OATES<br>Clerk of Court |
|---|---|