## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| CLAIRE HALL and JAMES HALL, <br><br> Plaintiffs, <br><br> v. <br><br> SOUTH KINGSTOWN POLICE DEPARTMENT, through the Town Manager James Manni; POLICE CHIEF MATTHEW C. MOYNIHAN; POLICE OFFICER MATTHEW WHITE; and POLICE OFFICER ANTHONY SOUZA, <br><br> Defendants. | C.A. No. 1:23-cv-00359-MSM-PAS |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

Claire Hall saw two young men on the side of the road after a car accident in South Kingstown, so she pulled over to help them. But she left the scene in the back of a police SUV, following an argument with the two responding officers. They charged her with disorderly conduct, obstruction of a police officer, and resisting arrest, but the charges were later dismissed via "Not Guilty" filings at the State's recommendation.

Mrs. Hall and her husband, James, then sued the South Kingston Police Department ("SKPD"), its chief Matthew Moynihan, and the on-scene officers,

Anthony Souza and Matthew White.[1]  Mrs. Hall primarily alleges a host of civil rights violations and torts.  (ECF No. 1.)  Discovery has closed, and the defendants collectively move for summary judgment.  (ECF No. 24.)  As explained below, summary judgment is DENIED as to the civil rights claims and the torts but RESERVED as to qualified immunity.  Further briefing is required for Mrs. Hall's claim under Rhode Island's Access to Public Records Act ("APRA").

## I.    BACKGROUND

### A.    February 2023 Incident[2]

This case started with a car accident on February 9, 2023.  (ECF No. 26-2 at 2.) When Mrs. Hall came upon the accident on Route 1 in South Kingston, Rhode Island, she pulled over to check on the two young men involved.  *Id.* at 4.  One of them, Van Limoges, was "frantically walking" around and "shaking," with "blood on his leg."  *Id.* Mrs. Hall lent Van her phone so he could call his father, Jim.  *Id.* at 5.  Jim asked Van if there was an adult on the scene, and Van handed the phone back to Mrs. Hall. *Id.* at 6.  They began to talk.  *Id.*  Jim wanted to know where to meet his son: at the scene of the accident or at the hospital.  *Id.*

---

[1] Aside from alleging loss of consortium, the Complaint does not allege facts specific to Mr. Hall.  For ease of reading, the Court often refers to Mrs. Hall as if she were the sole plaintiff.  Of course, the decision binds Mr. Hall, too.

[2] Unless otherwise noted, the facts in this section draw from the Court's review of Officer White's body camera footage, provided with the defendants' Motion for Summary Judgment.  (Link available at ECF No. 24-1 at 2.)  The incident described above begins about a minute and thirty seconds into the video.

Soon afterward, Officers White and Souza arrived.  Officer White walked up to Mrs. Hall and the two young men, asking "Three car?"  He then instructed Van to put his car in park and to try to turn it off.  Mrs. Hall, still speaking to Van's father, observed that Van was "shaking like crazy" and "probably should not be driving." Van then told Officer White that the key was stuck and broken.  Mrs. Hall asked the officers if they thought Van would be "taken from the scene," and they in turn asked her if she was involved in the accident.  She said, "No," explaining that she was speaking to Van's father on the phone.

Officer White raised his voice, asking "How many cars are involved right now?" Mrs. Hall, motioning to her car parked down the road, said, "Not mine.  That's mine." Officer White responded, "We need to get that off the road.  Alright?  Can we get that into the parking lot?"  Mrs. Hall, still holding the phone to her ear as she spoke to Van's father, tried to say something to the officers, but they assured her that they would "take care" of Van.  She responded that she was "just trying to tell" Van's father what was going on.  Officer Souza cut her off, gestured to the scene, and stated, "We're in the middle of the highway."  Officer White then asked her to please move her car again, to which Mrs. Hall replied, "Sure."  She began walking to her car, and Officer White started talking to the other young man involved in the accident.

Mrs. Hall stopped to speak with Officer White.  "All I'm saying is that I can leave, I just want to tell his father where–" to which Officer White interjected, "You don't have to leave.  Just move your car."  Mrs. Hall then remarked, "No, I'm going to leave."  Officer White ushered the young men to the side, asking Van whether Mrs.

3

Hall was his mother. Mrs. Hall tried to hand the phone to Officer White and asked, "Do you want to talk to his father? Why don't you talk to his father?"

Officer White raised his voice, emphatically stating: "I'm working. Can you please go sit in your car? You have nothing to do with this." Mrs. Hall responded that Van was a minor, that she was an attorney, and that Officer White "needed to tell her" where Van's father should meet them. Officer White retorted, "I don't need to tell you anything. I'm going to arrest you in a second if you don't get in your car. Do you understand me?"

A back-and-forth ensued. Mrs. Hall: "Oh, you're kidding me." Officer White: "I am not kidding you." Mrs. Hall, again: "You are kidding me." Officer White pointed to Mrs. Hall's car and raised his voice more. He said, "You are impeding an investigation right now and you are really bothering me. Go sit in your car." Mrs. Hall stepped backward, gesturing to the phone and raising her voice to match his. She repeatedly asked, "What should I tell his father? What should I tell his father?" Officer White responded, "I will talk to him in a minute."

Suddenly, Officer White screamed, "GET IN YOUR CAR, NOW!" Mrs. Hall tried to hand the phone to him, yelling, "Tell him! Tell him! Take it." Officer White then grabbed Mrs. Hall by the wrist as she began to scream and flail. "No! You do not touch me," she yelled. The officers grabbed her by the arms. She continued: "Oh my God! Stop it! Get your hands off me right now!" As she flailed, the officers repeatedly told her to "knock it off," and she repeatedly insisted that they get their hands off her.

4

As Mrs. Hall screamed, the officers leg-swept her, pushed her into the ground, and put her in handcuffs. Again, she yelled, "Oh my God! Are you fucking kidding me?" The officers ordered her to stop squirming, and she responded, "No, I will not stop." The struggle continued briefly, and Mrs. Hall, while on the ground, asked the young men involved in the car accident (now both observing the struggle) to record it. The officers stated that they were wearing body cameras.

"Why am I under arrest?" she asked. "Because you weren't listening to anything we were saying," answered Officer White. She continued to yell, and Officer Souza told her to "take a breather." She told him to take one. She then asked to move her arm because it hurt. As she was pressed into the ground, she warned the officers that she "already had a dislocated shoulder" and that they "were making it worse."

The officers sat her up and she told them to "take this fucking thing," presumably the handcuffs, off her "now." Officer White signaled to dispatch that he had one woman in custody for "disorderly and resisting." Mrs. Hall lamented, "Oh my God! You've got to be kidding." "Stop. Stop talking," ordered Officer White. Mrs. Hall pled, "No! I cannot even believe this. This is so ridiculous. I just wanted to know I could tell his father I was going to the hospital. I'm not even involved in this. I can't believe this." To her comment about not being involved, Officer White responded, "This was our point the whole time." To that, Mrs. Hall shouted, "I'm a good Samaritan who stopped to help a kid and this is what happens." The officers picked her up as she continued to yell, and they walked her to the police SUV over her repeated protests. "This man is beating the shit out of me," she yelled before she

was put in the SUV. "You guys don't know how much trouble you're in. I'm going to sue you for assault," she continued.

### B.    Legal Proceedings

The same day, Mrs. Hall was processed and charged with three misdemeanors: (1) obstructing an officer in execution of duty, in violation of R.I. Gen. Laws § 11-32-1; (2) disorderly conduct, in violation of R.I. Gen. Laws § 11-45-1; and (3) resisting arrest, in violation of R.I. Gen. Laws § 12-7-10. (ECF No. 29 at 12; No. 26-4 at 2.) She was released that day. (ECF No. 25 ¶ 34.) Five months later, the charges were dismissed via "Not Guilty" filings at the State's recommendation. (ECF No. 29 at 12; No. 26-4 at 3.)

### C.    Records Requests

While her criminal case sat pending, Mrs. Hall began anonymously submitting records requests to South Kingstown through APRA, R.I. Gen. Laws § 38-2-1, *et seq.*

First, Mrs. Hall submitted a request for a broad swath of records. That included "all arrest logs" in SKPD's possession from January 1, 2020, to April 16, 2023, as well as more specific information related to each, and "all investigatory records" related "to possible violations of a federal or state statute, rule, or regulation for the past ten years." (ECF No. 26-5 at 2.) South Kingstown responded that the request was unreasonable because it was unduly burdensome. *Id.* For instance, in denying her request for "all investigatory records" related to "possible violations" of law, it reasoned that "responding to this request would entail reviewing and potentially producing records related to every call for service within that ten-year

6

period, because every call may involve a possible violation" of state or federal law. *Id.* at 3. And because each would have to be reviewed and possibly redacted, analysis of the average call would take about 15 minutes. *Id.* Roughly 50,000 calls come in annually. *Id.* So 50,000 calls a year for 10 years, each analyzed for fifteen minutes, would lead to "an estimated 125,000 hours of search, review, and retrieval time on the low end." *Id.* At a rate of $15.00 an hour, that would cost $1,874,985, with half due up-front.[3] *Id.*

Not having more than $900,000 on hand to pay for records requests, Mrs. Hall withdrew that request and submitted a narrower one with eight specific asks. (ECF No. 26-7.) Generally the request still sought arrest logs, internal investigations, and internal affairs reports. *Id.* at 1–2. This time, South Kingstown estimated that it needed "approximately 50 hours" to find internal affairs documents and a "significant amount of search, retrieval, review, and redaction time" to respond to the other requests. *Id.* at 3. In total, it would take 100 hours and cost $1,485.

The same day that she received that response, Mrs. Hall withdrew the request and submitted seven individual requests, which purportedly "contained each of the eight paragraphs" listed in the request just described. (ECF No. 26-7 at 6.) In its response, South Kingstown complained that these individualized requests were "an apparent attempt to circumvent" a rule about itemized costs, so it gave Mrs. Hall the same estimate that she already received, $1,485. *Id.* at 6.

---

[3] South Kingstown provides the first hour at no cost. (ECF No. 26-5 at 4.)

Mrs. Hall evidently paid the $1,485, because on July 25, 2023, South Kingstown addressed her requests individually. (ECF No. 26-25.) It granted some requests and denied others. *Id.* at 3–6. Among the denied requests were:

- A request for "any and all standing orders of the South Kingstown Police Department that are not currently posted on the website," denied because they were exempt from disclosure based on R.I. Gen. Laws § 38-2-2(4)(D)(e) & (f). *Id.* at 3–4.

- A request for "any and all Town of South Kingstown and South Kingstown Police Department internal affairs reports" from January 2017 to April 2023, denied in part because four reports were "associated with pending civil actions/claims and/or pending criminal complaints." *Id.* at 4.

- Several requests for detailed lists of SKPD's investigations into alleged violations of state or federal law, denied because South Kingstown did not maintain those lists thus exempting them from disclosure under R.I. Gen. Law § 38-2-3(h). *Id.* at 4–5.

Among the granted requests were sets of arrest logs and already-published standing orders. *Id.* at 4–6.

### D.    Procedural History

Following that, Mrs. Hall and her husband sued the SKPD, Chief Moynihan, and Officers Souza and White. (ECF No. 1.) She brought eleven claims against them, including assault, battery, police brutality, and an APRA claim specifically against the SKPD. *Id.* ¶¶ 77–137. Following discovery, the defendants collectively moved for summary judgment. (ECF No. 24.)

## II.    JURISDICTION AND SUMMARY JUDGMENT STANDARD

The Court has federal-question jurisdiction over this case under 28 U.S.C. § 1331. Mrs. Hall seeks damages under 42 U.S.C. § 1983 alleging violations of her

civil rights by state officials.  "Almost by definition, a claim under § 1983 arises under federal law and will support federal-question jurisdiction [under § 1331.]" *Loc. Union No. 12004, United Steelworkers v. Massachusetts*, 377 F.3d 64, 75 (1st Cir. 2004). The Court has supplemental jurisdiction over most of Mrs. Hall's other claims under 28 U.S.C. § 1367, as the state and federal law claims arise from "a common nucleus of operative fact." *Corrigan v. R.I. Dept. of Bus. Reg.*, 820 F. Supp. 647, 664–65 (D.R.I. 1993) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).[4]

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine "if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and a fact is material "if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000).  But "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The evidence of the non-movant"—here Mrs. Hall—"is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255.

### III.    DISCUSSION

The Court divides its analysis into four parts: (1) the civil rights and torts claims brought against Officers White and Souza, (2) the supervisory liability claim

---

[4] As explained below, further briefing is necessary to determine whether the APRA claim satisfies the *Gibbs* test.

brought against Chief Moynihan, (3) the *Monell* claim against SKPD, and (4) the APRA claim.

## A.    Claims Against Officers Souza and White

Mrs. Hall brings nine claims against Officers Souza and White alleging civil rights violations and common-law torts.  The officers move for summary judgment on all nine, and their motion turns on four main arguments.

First, they argue that probable cause existed to justify the arrest, defeating Mrs. Hall's false arrest (Count V) and malicious prosecution (Count VI) claims.[5] Second, they contend that they used only reasonable force during the arrest, defeating her claims for assault (Count II), battery (Count III), police brutality and excessive force (Count IV), and intentional infliction of emotional distress (Count IX).  Third, they assert that the negligence claims (Counts VII and VIII) fail on the same grounds as the excessive force claims and alternatively because of their inconsistency with the intentional torts.  Fourth and finally, they submit that qualified immunity insulates them from suit no matter the merits of Mrs. Hall's claims.

### 1.    Probable Cause

To start, the officers argue that they are entitled to summary judgment on Mrs. Hall's state-law false arrest and malicious prosecution claims because the officers had probable cause to arrest her.  The Court agrees that if the officers had probable cause,

---

[5] The Court reads Mrs. Hall's first claim, a general allegation of "civil rights violations" in violation of 42 U.S.C. § 1983, as incorporating the more specific constitutional claims that follow it—particularly false arrest, malicious prosecution, and police brutality.  So the Court will not separately analyze Count I, because it rises or falls with the other claims.

these claims necessarily fail. *See Horton v. Portsmouth Police Dep't*, 22 A.3d 1115, 1123 (R.I. 2011) ("When probable cause exists to initiate a proceeding, a claim of malicious prosecution must fail; likewise, when probable cause exists to arrest, a claim of false arrest must fail as well.").

So the question is whether they had probable cause. More specifically, the question is whether the officers, "based on the available facts and acting as an ordinarily careful and prudent person, could have reasonably believed" that Mrs. Hall was committing the offenses for which she was charged. *Johnson v. Palange*, 406 A.2d 360, 364 (R.I. 1979). If the issue is "one on which reasonable persons might differ," it is "for the jury to decide." *Id.* at 365.

The officers rely on two theories of probable cause: (1) that Mrs. Hall violated R.I. Gen. Laws § 11-32-1, prohibiting obstruction of an officer in the execution of his duty and (2) that she violated R.I. Gen. Laws § 11-45-1, prohibiting disorderly conduct. The Court takes these in turn.

First, the Court rejects the argument that the officers had probable cause as a matter of law to arrest Mrs. Hall for obstruction of an officer's duty. Starting with her short exchange with the officers: in certain extreme circumstances, a "verbal harangue [may be] so staged and of such length and so disconcerting in character" that it does in fact constitute obstruction of an officer. *Palange*, 406 A.2d at 366. But under Rhode Island lawit remains a jury question whether Mrs. Hall's words fit that bill. *Id.* (explaining that "the jury was entitled to consider the length, character, and impact of plaintiffs' verbal harangue in determining whether or not Lieutenant

11

Palange could reasonably have believed that the obstruction statute had been violated"); *Kurland v. City of Providence*, 711 F. Supp. 3d 57, 71 (D.R.I. 2024). Likewise, SKPD policy indicates that her words alone likely do not qualify. (ECF No. 26-19 at 3 (explaining that an officer "cannot effect an arrest "for disorderly conduct just "because a citizen engages them in an argument," because an argument "is not evidence that the person is disorderly")). The Court is also unconvinced that Mrs. Hall's failure to drop everything and move her vehicle genuinely obstructed the officers' investigation. The video shows that her car did not actually obstruct the highway, because (1) police cruisers were parked behind and around it and (2) cars continued to pass in the right lane throughout the video.

Similarly, the Court rejects the argument that probable cause existed as a matter of law to arrest Mrs. Hall for disorderly conduct. The disorderly conduct statute forbids, among other things, engaging "in fighting or threatening, or in violent or tumultuous behavior" and obstructing "a highway." R.I. Gen. Laws § 11-45-1(a)(1), (4). True, Mrs. Hall had a verbal exchange with the officers and that she failed to move her car after being instructed to do so. But that is not necessarily disorderly conduct under the statute. Mrs. Hall's verbal exchange with the officers before her arrest—about three minutes total, primarily asking questions on behalf of Mr. Limoges—did not clearly amount to engaging "in fighting or threatening, or in violent or tumultuous behavior." R.I. Gen. Laws § 11-45-1(a)(1). Nor did her car actually obstruct the highway, as explained above.

So the Court cannot say, as a matter of law, that there was a probability that Mrs. Hall had committed, was committing, or was about to commit either offense for which she was arrested.  The decision is best left to the jury.  *See Palange*, 406 A.2d at 365 ("Although the evidence may have been susceptible to contrary reasonable conclusions, it was the jury's and not the trial justice's function to choose between them.").

The report of Mrs. Hall's proposed expert, Frank Mancini, bolsters the point. (ECF No. 26-8.)  Mr. Mancini is a longtime police officer, law enforcement leader, and self-described police accountability expert.[6]  *Id.* at 1–2.  He explained that, based on his review of the body camera footage, "Ms. Hall was not obstructing any investigation," and although she "may have been perceived by the officers as argumentative," "being argumentative with an officer is not a criminal violation." (ECF No. 26-8 at 6.)    All that led him to conclude, "Officers White and Souza did not have probable cause to arrest Ms. Hall on February 9, 2023."  *Id.*  Even setting aside the Court's determination that reasonable jurors could disagree about probable cause here, Mr. Mancini's expert testimony on this point would prevent summary judgment.

Because the underlying facts do not, as a matter of law, support the officers' finding of probable cause when they arrested Mrs. Hall, the Court DENIES summary

---

[6] Because the defendants have not moved to exclude his testimony, the Court has not yet determined whether Mr. Mancini is an expert whose testimony would satisfy *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Fed. R. Evid. 702.  While the defendants suggest striking other parts of his testimony (as explained below), they do not attack his probable cause conclusion.  The Court is satisfied that, at least for purposes of resolving this Motion, Mr. Mancini's testimony related to probable cause meets the criteria laid out in Fed. R. Evid. 702.

judgment for Officers White and Souza as to Counts V and VI.  As in *Palange* and *Kurland*, the ultimate determination of probable cause is better left to the jury.

### 2.    Excessive Force

Next, the officers argue that summary judgment is necessary for Mrs. Hall's police brutality/excessive force, assault, battery, and intentional infliction of emotional distress claims, because they did not use excessive force in arresting her.

For all these claims, the central inquiry is whether "the defendant officer employed force that was unreasonable under the circumstances." *Raiche v. Pietroski*, 623 F.3d 30, 36 (1st Cir. 2010); *see also id.* at 40 ("Where a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, our determination of the reasonableness of the force used under § 1983 controls our determination of the reasonableness of the force used under the common law assault and battery claims."). To do so, the Court must "balance the individual's interest against the government's, weighing three non-exclusive factors: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 36 (cleaned up) (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)).

The first factor favors Mrs. Hall.  The alleged crimes preceding arrest were some combination of disorderly conduct and obstruction of an officer, arising from about three minutes' worth of verbal exchange that turned intense only in the last minute.  These are best described as "relatively minor infractions" that likely do not

14

"justify an officer" in "slamming" Mrs. Hall to the ground, "let alone the additional force" the officers applied once she was there. *Raiche*, 623 F.3d at 36–37.

The second factor also favors Mrs. Hall. Aside from gesturing for Officer White to take the phone, the video shows that Mrs. Hall made no physical provocations toward the police. There is nothing to suggest that a woman who stopped on the side of the road to check on two young men in a car accident posed "an immediate threat" to the officers or others. *Id.* at 36.

The third factor admittedly could go either way. On the one hand, she was not "attempting to evade arrest by flight." *Raiche*, 623 F.3d at 36. On the other, the footage shows that she did struggle briefly with the officers. Still, she testified that the struggle was a response to the sudden shock of Officer White grabbing her. (ECF No. 24-2 at 32 ("I was struggling physically and emotionally in the sense that I was being attacked. I did not know I was being arrested. I was being attacked.")). Further complicating this analysis is that the First Circuit in *Raiche* noted that, when the plaintiff was not charged with resisting arrest, that favored him in the third part of the *Graham* analysis. 623 F.3d at 37. Mrs. Hall, by contrast, was charged with it, but that charge was ultimately dropped. (ECF No. 26-4 at 6.)

All that is to say: Mrs. Hall "has presented sufficient evidence to make out a jury question as to whether" the officers used excessive force. *Gray v. Cummings*, 917 F.3d 1, 9 (1st Cir. 2019). A jury could reasonably decide that the force used to arrest Mrs. Hall—a sudden grab, leg sweep, and hard press into the ground following

a nonviolent altercation with a bystander at a car accident—was excessive under the *Graham* factors.  Summary judgment is thus DENIED for Counts II, III, IV, and IX.

### 3.    Negligence

The officers next argue that summary judgment is necessary on Mrs. Hall's negligence claims because they are nearly identical with the excessive force claims.

It is true that some courts have held that "a plaintiff may not advance claims of excessive force and negligence predicated on identical facts." *Mucci v. Town of N. Providence ex rel. Vallee*, 815 F. Supp. 2d 541, 548 (D.R.I. 2011).[7]  The Court struggles to see why, though.  It may be right that a person "cannot commit an intentional tort negligently" and that "both inquiries focus on the reasonableness of an officer's actions." *Id.* at 548.  But it does not follow from those premises that the claims must merge at the summary judgment stage.

In similar contexts, plaintiffs have successfully brought both intentional and negligent tort theories arising from the same facts to trial.  *See, e.g., Castellucci v. Battista*, 847 A.2d 243, 245 (R.I. 2004) (affirming a jury verdict finding the defendant liable of both intentional and negligent infliction of emotional distress, among other torts, arising from a single incident); *Ryder v. Pearson Educ., Inc.*, 486 F. Supp. 3d 489, 507 (D.R.I. 2020) (holding that both intentional and negligent misrepresentation theories from the same facts survived summary judgment and should be submitted to the jury).  Why the result should differ for constitutional torts is unclear.  As Mrs.

---

[7] *Mucci* primarily relies on four out-of-circuit district court decisions, which in turn rely largely on a line of decisions from the District of Columbia Court of Appeals interpreting D.C. law and an Eleventh Circuit decision interpreting Florida law.

Hall's counsel acknowledged at argument, she cannot succeed on the merits of both claims, and she is not seeking double recovery. But the mechanism of summary judgment need not narrow her case unnecessarily if both sets of claims are ripe for a jury. *See Ryder*, 486 F. Supp. 3d at 507. And at this stage, they both are.

To boot, Rule 49 provides the Court plenty of latitude in ensuring the consistency of a jury verdict after a trial involving both intentional and negligent torts. *See* Fed. R. Civ. P. 49(a) (explaining that the Court may use methods of submitting issues to the jury "as it deems most appropriate"); *see also Putnam Res. v. Pateman*, 958 F.2d 448, 456 (1st Cir. 1992) (explaining that district courts have "wide discretion in constructing and utilizing verdict forms"). So the Court is well-positioned to ensure that the jury verdict is internally consistent; it indeed has a duty to do so. *See Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way. For a search for one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment."); *see also Covidien LP v. Esch*, 933 F.3d 45, 55–57 (1st Cir. 2021).

The Court thus declines to adopt *Mucci*'s reasoning. The jury is the better arbiter of whether the facts amount to an intentional or a negligent act. The Court DENIES summary judgment for the officers as to Counts VII and VIII.

### 4.    Qualified Immunity

Finally, the defendants argue that, merits aside, qualified immunity insulates them from suit.

The doctrine of qualified immunity shields both federal and state officials from liability for damages in a civil rights action "so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (cleaned up). A right is clearly established if its contours are "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up).

In resolving questions of qualified immunity at summary judgment, courts engage in a two-element inquiry. *See Tolan v. Cotton*, 572 U.S. 650, 655 (2014). First, the Court asks whether the facts "taken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a federal right." *Id.* (cleaned up). If so, the Court asks "whether the right in question was clearly established at the time of the violation." *Id.*

The discussion above shows that Mrs. Hall has sufficiently shown constitutional violations when all facts are construed in her favor. The Court thus moves to the second element—whether the rights violated were clearly established. Whether a right was clearly established is also a two-part inquiry. *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). "The first sub-part requires the plaintiff to identify either 'controlling authority' or a 'consensus of cases of persuasive

authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." *Alfano v. Lynch*, 847 F.3d 71, 75 (1st Cir. 2017) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). "The second sub-part asks whether an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law." *Id.* (citing *Wilson v. City of Boston*, 421 F.3d 45, 57–58 (1st Cir. 2005)). The Court must assess whether Mrs. Hall's allegations, as modified by the summary judgment record, make out a claim sufficient to overcome qualified immunity before denying a motion for summary judgment. *See Est. of Rahim by Rahim v. Doe*, 51 F.4th 402, 411 (1st Cir. 2022).

Taking the record in the light most favorable to Mrs. Hall, a reasonable jury could conclude that she was ordered to move and subsequently arrested and leg-swept without a legal basis while trying to fulfill a duty that she thought was required under Rhode Island's Good Samaritan laws. *See, e.g.*, ECF No. 24-2 at 28 ("I have a legal obligation as it is outlined in the Good Samaritan Statute in Rhode Island, yes."). It is clearly established that the Fourth Amendment requires cause to seize and prosecute an individual. *See, e.g.*, *Hayes v. Florida*, 470 U.S. 811, 816 (1985) (on arrests); *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994) (on orders to move: granting qualified immunity for the instant case but expressing an unwillingness to do so in future cases); *Wheeler v. Nesbitt*, 65 U.S. 544, 549 (1860) (on malicious prosecution). Without probable cause, qualified immunity is inappropriate under these circumstances. But because the Court has held that the remaining questions

19

of probable cause should be left to the jury, it will reserve the question of qualified immunity for after trial, too.

The same result is necessary for the excessive force claims.  To start, the First Circuit has been explicit: "Our case law supplies a crystal clear articulation of the right, grounded in the Fourth Amendment, to be free from the use of excessive force by an arresting officer." *Morelli v. Webster*, 552 F.3d 12, 23 (1st Cir. 2009).  "Given this well-settled jurisprudence, there is no legitimate doubt that the right asserted here was clearly established," so the officers are "on notice that a police officer's use of excessive force would be offensive to the Constitution." *Id.* at 24.

The defendants' reliance on the First Circuit's grant of qualified immunity in *Segrain v. Duffy*, 118 F.4th 45 (1st Cir. 2024), is misplaced.  That case concerned a prisoner's Eighth Amendment claim against a correctional officer for a leg sweep. *Id.* at 58.  At issue here is a civilian's Fourth Amendment claim against police officers for excessive force during an arrest, circumstances much closer to those in *Raiche* and *Morelli*, both cases where the First Circuit articulated the contours of the right clearly. *Raiche*, 623 F.3d at 38–39; *Morelli*, 552 F.3d at 23.

Though the right is clearly established, the inquiry is still "a complicated one," because the question remains whether the officers' use of excessive force here "constituted the type and kind of erroneous judgment that a reasonable police officer under the same or similar circumstances might have made." 552 F.3d at 23.  The inquiry is even more muddled by the summary judgment standard. *Id.* ("While the officers' accounts of the facts may justify the district court's appraisal, the court was

bound to ask not whether those accounts were plausible but, rather, whether under the plaintiff's version of the facts a reasonable officer should have known that the degree of force used was plainly excessive.").

In this case, the officers' conduct, "as described by the plaintiff, eclipsed the bounds of reasonableness." *Id.* A determination of qualified immunity, then, should be left for a later date. *See id.* (noting that the district court "erred in resolving" the qualified immunity question "in advance of trial" where the jury could find that the officers' use of force was "objectively unreasonable" and "plainly misguided" enough that "he should not be protected by the shield of qualified immunity").

So the defendants' motion for summary judgment on qualified immunity will be RESERVED until after trial, based on the jury's resolution of disputed questions about probable cause and excessive force. *See Kurland*, 711 F. Supp. 3d at 80.

### B.    Supervisory Liability Claim

In addition to Officers Souza and White, Mrs. Hall sues South Kingston's police chief, Matthew Moynihan, for damages stemming from the incident.

Supervisory liability must be based on the supervisor's own conduct; the doctrine of respondeat superior does not apply.[8] *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009). In other words, there must be an "affirmative link between the behavior of a subordinate and the action or inaction of his supervisor . . . such that

---

[8] In the Complaint, Count X is titled "respondeat superior liability." (ECF No. 1 at 21.) But the substance of the claim against Chief Moynihan is that he failed to "properly train, instruct, direct, and oversee police officers under his control and authority," a claim sounding in more general supervisory liability. *Id.* ¶ 133.

the supervisor's conduct led inexorably to the constitutional violation." *Feliciano-Hernandez v. Pereira-Castillo*, 663 F.3d 527, 533 (1st Cir. 2011).  At the least, a supervisory official must have actual or constructive notice of the violation and act deliberately by failing to resolve it.  *Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 768 (1st Cir. 2010).

Mrs. Hall argues that the "affirmative link" was primarily Chief Moynihan's failure to conduct annual reviews for Officers Souza and White.  *See* ECF No. 26-22 at 2.  That failure is striking, she argues, in light of clear SKPD policy requiring those reviews.  (ECF No. 26-21 at 2.)  And the failure is more troubling, she suggests, considering Mr. Mancini's conclusions that Officer White exhibited several "indicia of an aggressive police officer who needed retraining prior to his interaction with Ms. Hall" and that Chief Moynihan failed to "adequately intervene[]," even overruling another supervisor about the need for training, "when presented with signs" of Officer White's aggressive behavior that required retraining.  *See* ECF No. 26-8 at 9.  Finally, this failure is made all the more stark following the SKPD's loss of accreditation in 2024 on Chief Moynihan's watch—in part for its failure to adequately document use-of-force training—and his subsequent probation.  (ECF No. 26-24 at 3–4.)

The Court agrees with Mrs. Hall.  On the record just described, a reasonable jury could find that Chief Moynihan "made a deliberate decision not to act to resolve a known constitutional issue," the risk of officers using excessive force, "which led to the alleged constitutional violations."  *Kurland*, 711 F. Supp. 3d at 77.  If all that is credited (which the Court must do here), Mrs. Hall has sufficiently established a

supervisory liability claim. But, of course, whether it ultimately should be credited is a decision left for the jury.

This case is far afield from decisions rejecting supervisory liability claims. Consider the First Circuit's decision in *Seekamp v. Michaud*, 109 F.3d 802, 808 (1st Cir. 1997). There, the supervisory liability claim failed first because there was no underlying constitutional claim against subordinates. *Id.* Not so here, where there are multiple viable claims against Officers White and Souza. The supervisory liability claim in *Seekamp* also failed because the plaintiff "adduced no evidence of supervisory indifference to proper police training on the part of defendant Skofield, let alone a level of indifference sufficient to sustain a section 1983 supervisory liability claim." *Id.* Quite the contrary here, where the record, in the light most favorable to Mrs. Hall, shows year-after-year failings to review officers and a loss of accreditation in part based on inadequacies surrounding use-of-force training. ECF No. 27-22 at 2; ECF No. 26-24 at 3–4. Those facts alone defeat summary judgment. True, Officer White stated that he did receive regular trainings, some of which "could" have been about de-escalation and use-of-force. (ECF No. 24-6 at 40.) But that alone does not settle the issue in Chief Moynihan's favor, in light of the broader record and the summary judgment standard. Mrs. Hall's case is even clearer if Mr. Mancini's testimony were partially or fully admitted. *See* ECF No. 26-8 at 9.

And that leads to the question of the admissibility of Mr. Mancini's testimony as it relates to the supervisory liability claim. At points throughout their briefing, the defendants take issue with parts of Mr. Mancini's testimony about this issue, as

well as a later affidavit that he submitted. Their arguments circle around (1) what documents Mr. Mancini reviewed in reaching his conclusions and (2) various inconsistencies between his deposition and his second affidavit. (ECF No. 24-1 at 19–21; No. 27 at 5–12.)

The defendants' arguments highlight an apparent tension in the caselaw. In resolving a summary judgment motion, "the district court properly considers only evidence that would be admissible at trial." *In re Namenda Direct Purchaser Antitrust Litigation*, 331 F. Supp. 3d 152, 168 (S.D.N.Y. 2018). But because "the summary judgment process does not conform well to the discipline that *Daubert* imposes, the *Daubert* regime should be employed only with great care and circumspection at the summary judgment stage." *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997). More clearly, the tension is this: though the Court should only consider evidence that would be admissible at trial, the First Circuit has instructed district courts to apply the usual framework to evaluate admissibility sparingly at this stage of litigation. All that is further complicated here by the fact that the defendants have not actually moved to exclude the testimony yet. They only seek to strike parts of it, and they make the arguments only intermittently throughout their briefs. (ECF No. 24-1 at 19–21, No. 27 at 5–12.)

The defendants' first argument—about which records were reviewed, made mainly in their opening brief—is, at this stage, an unconvincing effort to disqualify Mr. Mancini's testimony. The First Circuit has explained that courts should hesitate before raking "a fine-tooth comb" through an expert's dataset. *Lawes v. CSA*

24

*Architects & Engineers, LLP*, 963 F.3d 72, 99 (1st Cir. 2020). For reliability purposes, "the court's evaluation of the data must be limited to determining whether it provides adequate support to mark the expert's testimony as reliable." *Id.* at 102 (cleaned up); *see also Rodriguez v. Hosp. San Cristobal, Inc.*, 91 F.4th 59, 71–72 (1st Cir. 2024) ("As *Daubert* makes clear, questions about the strength of the factual underpinning of an expert's opinion are matter[s] affecting the weight and credibility of the testimony and therefore a question to be resolved by the jury.") (cleaned up). The Court sees *Lawes* and *Rodriguez* as settling the questions about reliability in favor of Mrs. Hall, at least for summary judgment purposes. Given his expertise, Mr. Mancini's review of the body camera footage and the depositions alone would likely render his opinions reliable. (ECF No. 24-5 at 15–22.) That said, the defendants are free to develop their argument more fully in a pretrial *Daubert* motion.

The second argument—about inconsistencies between his deposition and the second affidavit, made in the defendants' reply brief—has more teeth, but it raises questions that likely should be settled with the first argument. Even so, recognizing the strength of the argument, the Court does not rely on the second affidavit as evidence for purposes of resolving the summary judgment motion. *See Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993) (explaining that "inadmissible evidence may not be considered" at summary judgment); *Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc.*, 447 F.3d 105, 110–11 (1st Cir. 2006) (identifying factors to determine when a district court should disregard an affidavit submitted in opposition to a summary judgment motion). To be clear: the Court's holding denying summary

25

judgment does not turn on the second affidavit, but the Court will not strike it from the record at this point, either. Again, the defendants can renew their arguments in a pretrial *Daubert* motion.

Summary judgment thus is DENIED as to the supervisory liability claim against Chief Moynihan.

### C.    Municipal Liability Claim

Mrs. Hall also sued SKPD for the officers' alleged violations. Her theory rests largely on its failure to adequately train Officers Souza and White.

The Court begins by explaining the applicable framework for a municipal liability claim under *Monell v. N.Y. City Dep't of Soc. Servs.*, 43 U.S. 658 (1978). In *Wadsworth v. Nguyen*, the First Circuit recently laid it out:

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation. *Monell* liability cannot be premised on vicarious liability but must be based on the governmental body's own illegal acts. It is only when the governmental employees' execution of a government's policy or custom ... inflicts the injury and is the moving force behind the constitutional violation that a municipality can be liable.

129 F.4th 38, 66 (1st Cir. 2025) (cleaned up). More simply, the "two basic elements" are (1) whether Mrs. Hall's injury "was caused by a constitutional violation" and (2) whether the SKPD "can be held responsible for that violation." *Id.* (cleaned up). Given the extended discussion above about constitutional violations, the first element is satisfied. So the analysis here largely turns on the second element, responsibility.

In most cases, a governmental entity cannot be held responsible "unless an action pursuant to official municipal policy caused their injury" and "municipal

decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies." *Id.* (cleaned up). Deliberate indifference, in turn, requires a showing that SKPD disregarded "a known or obvious risk of serious harm following from its failure to develop an adequate training program." *Id.* at 68. That "knowledge can be imputed to a municipality through a pattern of prior constitutional violations." *Id.* But sometimes, a pattern of violations may not be needed if the "violation of [a] federal right[ ] is a highly predictable consequence of a failure to equip [governmental actors] with specific tools to handle recurring situations." *Id.* at 68 (cleaned up).

Mrs. Hall suggests her case is the second, rarer type. It is premised not on a pattern of violations, but on Mrs. Hall's constitutional violation being the highly predictable consequence of at least eight "widespread customs, habits, or practices."[9] (ECF No. 26-1 at 29.) Mrs. Hall recognizes that there is great overlap between this claim and the previous claim of supervisory liability.

And, like the previous claim, the Court holds that Mrs. Hall has produced sufficient evidence which, if believed, would support municipal liability under *Monell*

---

[9] Mrs. Hall identifies these as follows: (1) "conducting internal affair investigations that are perfunctory"; (2) "ignoring and/or overruling recommendations in internal affairs investigation reports for discipline and/or training"; (3) "permitting employees to use excessive force despite evidence of recurring failure to investigate, discipline, reprimand, punish, supervise, train and/or take any remedial steps with regard to prior use of force allegations"; (4) "failing to implement procedural safeguards to prevent constitutional violations"; (5) "failing to undertake basic forms of supervision and training"; (6) "failing to conduct annual performance evaluations and/or otherwise review or monitor employee conduct"; (7) "failing to enforce yearly training of officers in de-escalation and use-of-force"; and (8) "failing to discipline employees for sustained allegations of misconduct." (ECF No. 26-1 at 29.)

on the part of the SKPD and its officials.  Again, the record shows that SKPD failed year-after-year to provide annual reviews for officers, despite departmental policy requiring otherwise, as well as a loss of accreditation in part given inadequacies surrounding the documentation of their use-of-force training.  ECF No. 27-22 at 2; ECF No. 26-24 at 3–4.  Those facts alone defeat summary judgment, because it is "highly predictable" as a matter of common sense that officers like those in this case— who (1) are not regularly reviewed and (2) are working in a department that fails to take documentation about its use-of-force training seriously, so much so that it lost accreditation in part over it—would arrest someone without probable cause using excessive force.  129 F.4th at 68.  Weighing against that conclusion is, among other things, Officer White's testimony about regular trainings occurring, but that simply supports the conclusion that a jury should be entitled to resolve the dispute.  (ECF No. 24-5 at 15–22.)  And, as described above, Mrs. Hall's case is even stronger if Mr. Mancini's testimony were partially or fully credited.  (ECF No. 26-8 at 9.)

Summary judgment is thus DENIED as to Count X.

### D.    APRA Claim

Finally, the defendants move for summary judgment on Mrs. Hall's APRA claim.  They make three main arguments: (1) that Mrs. Hall filed the action "without availing herself of the limited remedies set forth in the enabling act," (2) that there "was no denial" to her APRA requests, and (3) that "APRA does not provide a private right of action for damages, but is limited by the plain language of the statute to

injunctive and declaratory relief, which is not requested here." (ECF No. 24-1 at 25–27; No. 27 at 12.) The Court addresses these in turn.

First, the Court disagrees that Mrs. Hall's claim must fail because she failed to avail "herself of the limited remedies set forth in the enabling act." APRA plainly establishes an option, following denial of a records request, of "retaining private counsel for the purpose of instituting proceedings for injunctive or declaratory relief." R.I. Gen. Laws § 38-2-8. That is what Mrs. Hall did here, asserting that the Court had supplemental jurisdiction over the APRA claim because of its relationship to her federal-question claims.[10]

Second, the Court disagrees that there "was no denial" of her APRA requests. The record shows otherwise. *See* ECF No. 26-25 at 3–5 (denying requests for standing "orders that are not posted on the website," for four internal affairs reports "associated with pending civil actions/claims and/or pending criminal complaints," and for three sets of lists that the SKPD purportedly did not maintain). Of course, whether South Kingstown had adequate legal grounds to deny the records is a separate question than whether there was any denial at all; the legal adequacy of the denial is the next question the Court must answer.

---

[10] The defendants did not argue that the language "in the superior court of the county where the record is maintained," right after the above material, excluded the Court's jurisdiction, and rightly so. Based on the First Circuit's recent decisions in *289 Kilvert, LLC v. SBC Tower Holdings LLC*, 133 F.4th 1, 5–7 (1st Cir. 2025) and *Emigrant Mortg. Co. v. Bourke*, 127 F.4th 385, 389–90 (1st Cir. 2025), the Court would hesitate to read the statute that way. *See 289 Kilvert, LLC*, 133 F.4th at 5–6 ("The clause at issue reflects an attempt to apportion subject matter jurisdiction solely among Rhode Island state courts. It does not purport to divest a federal court of jurisdiction to hear landlord-tenant disputes which are properly before it.")

Third, the Court disagrees with the defendants' characterization of Mrs. Hall's APRA action.  They observe, for example, that APRA does not "provide a private right of action for damages, but is limited by the plain language of the statute to injunctive and declaratory relief, which is not requested here."  (ECF No. 27 at 12.)  But civil fines for non-compliance, attorney's fees, a court order requiring compliance, and return of improper fees are all remedies contemplated within the statute.  *See* R.I. Gen. Laws § 38-2-9(d) (establishing that the Court can order civil fines, payment for production of records, and attorneys' fees against a defendant).  And the Complaint makes clear that Mrs. Hall seeks "civil fines" for the defendants' "knowing, willful, and reckless violation" of APRA, "as well as reasonable attorney fees and costs."  (ECF No. 1 at 23.)  She also seeks an order that the defendants "comply with the records requests and return all fees and costs paid by plaintiffs for said records."  *Id.*  These are well-within the scope of the APRA's remedies.

Rejection of the defendants' arguments here, however, is not sufficient to settle the APRA claim.  As discussed at the hearing, the parties shall provide additional, focused briefing on the APRA claim to aid the Court in deciding it.

The supplemental briefing should first address whether the Court should exercise supplemental jurisdiction over the APRA claim.  At this point, the Court is not confident that the APRA claim and the § 1983 claims "derive from a common nucleus of operative fact" or that Mrs. Hall "would ordinarily be expected to try them all in one judicial proceeding."  *Gibbs*, 383 U.S. at 725.  The public records requests began months after the February 2023 incident.  The APRA claim also seems to

involve a different defendant—the town of South Kingstown, rather than the SKPD—and a different set of documents than the other claims, and it is far afield from the usual cases the Court hears, possibly raising "a novel or complex issue of state law." 28 U.S.C. § 1367(c)(2).  Given the Court's "responsibility to police the border of federal jurisdiction," this jurisdictional issue must be settled before the Court can proceed to the merits of the claim.  *Spielman v. Genzyme Corp.*, 251 F.3d 1, 4 (2001).

The briefing should also identify which specific denials Mrs. Hall is suing over; explain whether South Kingstown had adequate legal grounds for those denials; discuss, in detail and with supporting caselaw, the appropriate remedies; and address any other outstanding issues related to the APRA claim.

Mrs. Hall shall have 30 days from the date this order is filed to submit that briefing, and the defendants will have 14 days to reply.  The Court will then issue an order related to the records request ahead of trial.

## IV.  CONCLUSION

The defendants' Motion for Summary Judgment (ECF No. 24) is DENIED as to the civil rights claims and the torts but RESERVED as to qualified immunity.  The parties will provide the Court additional briefing on the APRA claim as described above.

IT IS SO ORDERED.

_____
Mary S. McElroy,
United States District Judge


June 9, 2025